MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 38
Docket:        PUC-12-247
Argued:        January 16, 2013
Decided:       March 4, 2014

Panel:         SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.


HOULTON WATER COMPANY et al.

v.

PUBLIC UTILITIES COMMISSION


SAUFLEY, C.J.

[¶1]  The Office of the Public Advocate, Houlton Water Company, and the Industrial Energy Consumer Group (IECG) (collectively, the intervenors) appeal from the Public Utilities Commission's approval, with multiple conditions, of the reorganization of two regulated electrical utilities in Maine.  The reorganization involves changes in the corporate ownership of specific entities that transmit and distribute electricity in Maine such that they will be held in common ownership with generators of electricity in Maine, primarily generators of electricity from wind power.  The intervenors urge us to conclude that the Electric Industry Restructuring Act, 35-A M.R.S. §§ 3201-3217 (2013), prohibits, as a matter of law, the proposed union under a single ownership of transmission-and-distribution utilities and electricity generators.  Alternatively, the intervenors argue that the specific affiliations and financial relationships proposed here contravene the goals

of the Act, the Commission erred in its legal analysis and its factual findings, and the Commission abused its discretion in approving and setting conditions on the reorganization.

[¶2] We conclude that the Commission's interpretation of the Act's prohibition on "financial" relationships is inconsistent with the goals and language of the Act. We vacate the approval and remand for further proceedings.[1]

## I. OVERVIEW

[¶3] Effective in 1999 and 2000, the Legislature substantially changed the regulation of Maine's electricity industry. *See* 35-A M.R.S. § 3204. By separating the generation of electricity from its transmission and distribution (T&D),[2] the Electric Industry Restructuring Act was intended to effectuate the Legislature's goal of encouraging competition and innovation in the generation of electrical power. *See id.* §§ 3202, 3203. "One of the purposes of the Restructuring Act was to create a competitive market in which Maine's citizens would be able to comparison shop among various competitive electricity providers for their personal

---

[1] Because we remand for further proceedings based on an error in statutory interpretation, we express no opinion on the intervenors' other arguments on appeal.

[2] As do the parties, we refer to the regulated entities that transmit and distribute electricity in Maine as "T&D" utilities. T&D utilities are public utilities. 35-A M.R.S. § 102(13) (2013). The Restructuring Act defines a T&D utility, in relevant part, as "a person, its lessees, trustees or receivers or trustees appointed by a court, owning, controlling, operating or managing a transmission and distribution plant for compensation within the State." 35-A M.R.S. § 102(20-B) (2013).

and commercial electricity generation services." *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 2, 818 A.2d 1039.

[¶4] To achieve its goals, the Act mandated that companies holding both generation and T&D assets divest themselves of the generation assets and generation-related activities by March 1, 2000. 35-A M.R.S. § 3204(1). Following divestiture, the Commission continues to regulate and oversee T&D utilities, which hold monopolistic rights to the limited T&D resources in Maine. *See, e.g., id.* § 3204(5), (6). "Because the Restructuring Act allowed the investor-owned electric utilities to keep their transmission and distribution assets, the former electricity providers were transformed into transmission and distribution utilities . . . fully regulated by the Commission." *Competitive Energy Servs.*, 2003 ME 12, ¶ 2, 818 A.2d 1039.

[¶5] At the same time, the regulation of the production and generation of electricity was greatly reduced, so much so that the parties refer to power generation as "unregulated" in Maine, although the generators are subject to some restrictions and must be licensed. *See generally* 35-A M.R.S. § 3202 (deregulating retail access to generation services); *id.* § 3203 (authorizing the Commission to license competitive electricity providers). In addition, the Act authorized competitive electricity providers to market, broker, aggregate, or sell the generated electricity to the public. *Id.* §§ 3201(5), 3202(1). Recognizing the potential effects

4

on competition, the Act now gives the Commission the authority to order divestiture by a T&D utility if another entity purchases 10% or more of the stock of the T&D utility and the Commission determines that an affiliated competitive electricity provider thereby obtains an unfair market advantage. *See id.* § 3206-A(2).

[¶6]    Following divestiture, any major change in the ownership or organization of a T&D utility is considered to be a reorganization that must be approved by the Commission. *See id.* §§ 708, 3204(5) (2013). The Restructuring Act and the more broadly applicable statute that regulates public utilities' reorganizations, *id.* § 708, provide the statutory basis for the Commission's review of the complex corporate transactions between and among energy corporations and their respective affiliates.[3]

---

[3]    The Restructuring Act defines "affiliate" for purposes of this dispute. *See* 35-A M.R.S. §§ 707(1)(A), 3201(1) (2013). The Restructuring Act provides, "'Affiliated interest' has the same meaning as provided in section 707, subsection 1, paragraph A." 35-A M.R.S. § 3201(1). Section 707(1)(A) provides,

"Affiliated interest" means:

**(1)** With respect to a public utility . . . :

**(a)** Any person who owns directly, indirectly or through a chain of successive ownership 10% or more of the voting securities of a public utility;

**(b)** Any person, 10% or more of whose voting securities are owned, directly or indirectly, by an affiliated interest as defined in division (a);

**(c)** Any person, 10% or more of whose voting securities are owned, directly or indirectly, by a public utility;

[¶7]  The appeal before us involves a challenge to a proposed reorganization that, in the end, involves several business entities that provide T&D or generation services in Maine.[4]  Specifically, the Commission approved two petitions for reorganization—one filed by T&D utilities Bangor Hydro-Electric and Maine Public Service Company (MPS), and the other filed by the newly formed Northeast Wind Holdings, LLC, all of which are owned by a Canadian corporation, Emera, Inc., which operates in northeastern North America, in three Caribbean countries, and in California.  The evidence indicated that, at the time of the hearings, more than 80% of Emera's earnings came from regulated utilities.

[¶8]  In essence, the reorganization would allow Emera to make two major changes in its holdings.  First, while continuing to hold the T&D utilities, Bangor Hydro and MPS, Emera would be allowed to obtain a greater share of electricity generators that generate power in Maine.  Specifically, it would increase its ownership share of Algonquin Power & Utilities Corp. (APUC), a Canadian

---

**(d)** Any person, or group of persons acting in concert, that the commission may determine, after investigation and hearing, exercises substantial influence over the policies and actions of a public utility, if the person or group of persons beneficially owns more than 3% of the public utility's voting securities; or

**(e)** Any public utility of which any person defined in divisions (a) to (d) is an affiliated interest.

[4]  As authorized by statute, the Commission entered several protective orders in these proceedings, shielding from public view a substantial amount of proprietary business information, not otherwise available to the public, that was required to be filed with the Commission in the course of the reorganization proceedings.  *See* 35-A M.R.S. § 112 (2013).  To effectuate those orders, this decision contains only those details of the transactions that are necessary to an understanding of the matters on appeal.

company that owns and operates a diversified portfolio of electrical generation and utility distribution businesses in North America, including several that generate electricity in Maine. Second, Emera would be authorized to engage in a joint venture with First Wind Holdings, LLC, a wind energy developer, to establish a new wind generation company to be called JV Holdco. JV Holdco would own and operate wind generation projects in Maine, Vermont, and New York.

[¶9] Thus, the proposed transactions would allow Maine's regulated T&D utilities—Bangor Hydro and MPS—to be held in common ownership with companies engaged in electricity generation in Maine, including several developers of wind energy projects. *Cf. id.* § 707(1)(A). This ownership structure would not have been allowed during the initial divestiture phase of the Restructuring Act. *See id.* § 3204(1). The intervenors argue that it is not allowed now. We must therefore determine whether the Restructuring Act prohibits or limits the proposed reorganizations.

## II. BACKGROUND

A.    Proposed Transactions

[¶10] The Commission consolidated two petitions for hearing and decision, each of which proposed a specific transaction. The first transaction involves Emera's plan to increase its ownership in APUC from 8.2% to a maximum of 25%

(the APUC transaction). One APUC subsidiary owns generation assets[5] in Maine, and owns a subsidiary that acts as a competitive electricity provider, which is a "marketer, broker, aggregator or any other entity selling electricity to the public at retail." *Id.* § 3201(5). The initial plan was for APUC and Emera to engage in a joint venture in the creation of a new entity, Northeast Wind Holdings, but when APUC ultimately withdrew from that venture, the plan was altered to provide that Emera would own 100% of Northeast Wind Holdings. As a result, the proposal did not, at that stage, implicate section 3206-A(2), which regulates the relationships between T&D entities and competitive electricity providers.

[¶11] The second transaction involved a proposed joint venture between that Emera subsidiary, Northeast Wind Holdings, and subsidiaries of First Wind Holdings, LLC, an entity involved in the development of utility-scale wind energy projects. Through this transaction, a newly created entity to be known as JV Holdco LLC would be held in joint ownership by the Emera-owned Northeast Wind, which would acquire a 49% interest in JV Holdco, and First Wind, which would hold the remaining 51% interest. To obtain its 49% interest, Emera-Northeast Wind would invest $333 million in the form of equity and a loan that may be converted to equity. First Wind would transfer a variety of wind

---

[5] The Restructuring Act defines generation assets to include "all real estate, fixtures and personal property owned, controlled, operated or managed in connection with, or to facilitate, the generation of electric power." 35-A M.R.S. § 3201(10) (2013).

8

projects in Maine and the northeast to JV Holdco. Additional wind projects could be transferred to JV Holdco over the next decade that would commit Emera, through Northeast Wind, to provide 49% of the necessary funding—more than $1 billion.[6]

[¶12] The First Wind transaction also involves the transfer of the Stetson Generator Lead[7] to Northeast Wind or another Emera affiliate, and the execution of a Memorandum of Understanding between Bangor Hydro and First Wind whereby First Wind would purchase twenty years of transmission capacity from a T&D project undertaken by Bangor Hydro and National Grid.

[¶13] Accordingly, Bangor Hydro and MPS, both highly regulated providers of electricity transmission and distribution in Maine, would be Emera affiliates, and JV Holdco, which will own substantial generation assets located in Maine, would also be owned in part by Emera. *See id.* §§ 707(1)(A), 3201(1). Emera would also have a substantial financial relationship with First Wind, which holds generation or generation-related assets, through the joint venture of their subsidiaries.

---

[6] The agreement allows for the expedited financing of new "shovel ready" projects if certain conditions are met.

[7] Generation lead lines connect generation facilities to transmission lines.

[¶14]  Primary among the concerns raised by the intervenors in response to the proposed reorganizations is the potential that an owner of generation assets such as JV Holdco or First Wind would, through these shared economic and business connections, obtain a competitive advantage over other generators in access to transmission and distribution by Bangor Hydro and MPS, thus potentially defeating the purposes of the Restructuring Act.

B.    Procedural Background

[¶15]  On April 26, 2011, as required by 35-A M.R.S. § 708(2), Bangor Hydro and MPS filed a request for reorganization[8] concerning the originally anticipated APUC transaction.[9]  On May 5, 2011, the newly formed Northeast Wind requested Commission approval for the First Wind transaction.  The hearing examiner consolidated the petitions into a single proceeding.  Houlton Water, the Public Advocate, and IECG, among others, intervened.

---

[8]  Section 708(1)(A) defines "reorganization" as

> any creation, organization, extension, consolidation, merger, transfer of ownership or control, liquidation, dissolution or termination, direct or indirect, in whole or in part, of an affiliated interest as defined in section 707 accomplished by the issue, sale, acquisition, lease, exchange, distribution or transfer of voting securities or property.

35-A M.R.S. § 708(1)(A) (2013).  Section 708 further provides that "no reorganization may take place without the approval of the commission" unless "exempted by rule or order of the commission." 35 M.R.S. § 708(2)(A) (2013).  The Commission may not approve the reorganization of a public utility "unless it is established by the applicant for approval that the reorganization is consistent with the interests of the utility's ratepayers and investors." *Id.*

[9]  Although Bangor Hydro and MPS's filing requested an exemption from the requirement of reorganization approval, the Commission treated their petition as a request for reorganization.

[¶16] In August 2011, the Public Advocate and Houlton Water, among others, moved to dismiss the petitions on the ground that the Commission's approval of the reorganization petitions would violate the Restructuring Act by allowing T&D utilities' corporate owner to own generation assets in Maine. The Commission denied the motion, concluding that 35-A M.R.S. § 3204(5)[10] "clearly prohibits utilities from owning generation assets, but does not explicitly prohibit such ownership by utility affiliates." The Commission reasoned that "the Legislature was aware of affiliate issues at the time it enacted the [Restructuring Act] . . . and could have explicitly prohibited affiliated ownership if that was the intent."

[¶17] In preparation for the hearing on the reorganization requests, Bangor Hydro and MPS filed testimony from officers at Emera Energy, Inc.;[11] First Wind; Algonquin Energy Services, Inc.;[12] and Bangor Hydro. The Public Advocate filed the testimony of a consultant. The hearing examiners for the Commission conducted a hearing in the Commission's presence over the course of four days in

---

[10] Title 35-A M.R.S. § 3204(5) (2013) provides, "**Ownership of generation prohibited.** Except as otherwise permitted under this chapter, on or after March 1, 2000, an investor-owned transmission and distribution utility may not own, have a financial interest in or otherwise control generation or generation-related assets."

[11] Emera Energy, Inc., is a wholly-owned direct subsidiary of Emera.

[12] Algonquin Energy Services, Inc., is a wholly owned indirect subsidiary of APUC and is currently a Maine competitive electricity provider. *See* 35-A M.R.S. § 3201(5) (2013).

December 2011, and heard testimony from several of the witnesses who had pre-filed testimony and from Emera's president and chief executive officer. *See id.* § 1305(2) (2013).

[¶18] In January 2012, the hearing examiners issued their report. *See id.*; 9 C.M.R. 65 407 110-7, -23 to -24 §§ 105(p), 750-752 (1999).[13] The hearing examiners recommended that both reorganization requests be denied. Although the examiners' report concluded that the proposed transactions were not prohibited by the financial interest or control prongs of 35-A M.R.S. § 3204(5), the examiners concluded that the net result to the public would be harmful, *see id.* § 708(2)(A)(9). Finding "that the risk of harm to ratepayers exceeds the benefits, even if conditions intended to mitigate the risk of harm to ratepayers were imposed," the examiners concluded that Bangor Hydro and MPS "have not met their burden of demonstrating no net harm to ratepayers as set forth in [section] 708." The examiners also rejected the APUC transaction because of "the lack of benefits and the risks of undue preference created by the affiliation" between MPS and APUC. In the event that the Commission were to allow the reorganization, the examiners' report recommended that "any approval of the Proposed Transactions must include substantial and comprehensive conditions." The examiners listed nearly thirty conditions that would protect against "harm to ratepayers of [Bangor Hydro] and

---

[13] Chapter 110 of the Commission's rules was recently replaced, effective November 26, 2012, and codified at 9 C.M.R. 65 407 110 -1 to -13 §§ 1-14 (2013).

12

MPS in the form of higher T&D rates" and harm to the competitive market from preferential treatment of Emera affiliates.

[¶19]  Pursuant to 9 C.M.R. 65 407 110-32 § 1001 (1999), Bangor Hydro and MPS filed exceptions to the examiners' report.  APUC then filed a letter informing the Commission that it had withdrawn from the Northeast Wind and JV Holdco transactions.  The examiners ordered Bangor Hydro and MPS to provide a statement of clarification regarding changes to the proposed reorganization and provided the intervenors with an opportunity to respond.  The statement of clarification explained that the First Wind transaction would remain substantially the same except that APUC would not have any ownership interest in JV Holdco and instead Emera would finance 100% of the investment in Northeast Wind.

[¶20]  The Commission then reopened the record, over the intervenors' objections, "for the sole and limited purpose of . . . develop[ing] the record on . . . issues related to APUC's withdrawal from the First Wind transaction."  The Commission took evidence concerning (1) "[t]he financial impact on Emera and its Maine utility affiliates from APUC's withdrawal" and (2) "[t]he impact on the northern Maine market issues resulting from APUC's withdrawal."[14]

---

[14]  On February 2, 2012, the intervenors moved to dismiss the reorganization approval proceeding based on (1) the unauthorized filing of First Wind's exceptions and APUC's letter and (2) Bangor Hydro and MPS's proposal of new conditions in their exceptions to the examiners' report.  Although acknowledging that Bangor Hydro and MPS's "actions in response to the Examiners' Report created substantial substantive and procedural concerns and may not constitute proper practice," the Commission

[¶21]  After deliberations, the Commission approved both the APUC and First Wind transactions with extensive conditions.  The Commission interpreted section 3204(5) as not prohibiting the affiliation of T&D utilities and generation entities with a shared parent company.  It then turned its focus to section 3204(5)'s provision that utilities "may not own, have a financial interest in or otherwise control generation or generation-related assets," and determined that, to contravene the statute, the T&D utility would have to hold "some type of control over the affiliates' generation assets."  The Commission reasoned that such control "would occur, for example, if a utility owned a subsidiary that owns and operates generation assets," but that Bangor Hydro and MPS "will have only the type of financial interest that any entity has in the success of its affiliates."

[¶22]  The Commission imposed more than fifty conditions on Bangor Hydro and MPS as well as on nonparties First Wind, Emera, APUC, and their affiliates to mitigate the risk that the proposed transactions would not be "consistent with the interests of the utility's ratepayers and investors."  35-A M.R.S.  § 708(2)(A).  The Commission explained that the proposed transactions, considered together, "would provide significant benefits to Maine

---

concluded that "those actions [did] not justify dismissal of this proceeding."  The decision "emphasize[d] that the Commissioners (as is the case with judges) are capable of . . . disregarding information that is outside the record" and rejected the intervenors' claims that First Wind's and APUC's filings constituted ex parte communications.  Furthermore, the Commission concluded that the suggestion of new conditions by Bangor Hydro and MPS "was not improper" because "[a] party's exceptions provide the only mechanism to respond to conditions proposed for the first time in an Examiners' Report."

ratepayers," and that the imposed conditions would "sufficiently mitigate" the potential risks. Therefore, according to the Commission, the transactions "will not, on net, be harmful to ratepayers."

[¶23] After the Commission ruled on a motion for reconsideration and modified one of the conditions it imposed, the intervenors filed a timely appeal from the Commission's order approving reorganization. *See* 35-A M.R.S. § 1320 (2013); M.R. App. P. 2(b)(3), 22.

## III. DISCUSSION

[¶24] In an appeal from a decision of the Public Utilities Commission, our review is deferential, and "[o]nly when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution" will we intervene. *Dunn v. Pub. Utils. Comm'n*, 2006 ME 4, ¶ 5, 890 A.2d 269 (quotation marks omitted). We apply a two-part inquiry when reviewing the Commission's interpretation of a statute that it administers and is within its expertise. *Competitive Energy Servs.*, 2003 ME 12, ¶ 15, 818 A.2d 1039. First, we determine de novo whether the statute is ambiguous. *Id.* "An ambiguous statute has language that is reasonably susceptible of different interpretations." *Dep't of Corr. v. Pub. Utils. Comm'n*, 2009 ME 40, ¶ 8, 968 A.2d 1047 (2009) (quotation marks omitted). Second, if the statute is not ambiguous, we determine whether the Commission misconstrued the statute's

plain meaning. *Id.* If the statute contains any ambiguity, however, we review the Commission's construction for reasonableness, according "great deference to the Commission's interpretation." *Id.* (quotation marks omitted); *see also Competitive Energy Servs.*, 2003 ME 12, ¶ 15, 818 A.2d 1039.

A.    Does Section 3204(5) Impose a Blanket Prohibition Against Maine T&D Utilities Sharing an Affiliate with Maine Generation and Generation-related Assets?

[¶25]  All parties agree that the proposed transactions involving Emera, First Wind, and APUC would result in Emera—a company with an affiliated interest in Maine T&D utilities Bangor Hydro and MPS—also holding what would constitute an "affiliated interest" in subsidiaries engaged in electric generation in Maine if that term applied to generators. *See* 35-A M.R.S. § 707(1)(A)(1)(a) (defining "affiliated interest" with respect to a T&D utility to include "[a]ny person who owns directly, indirectly or through a chain of successive ownership 10% or more of the voting securities of a public utility"). Specifically, the Commission found that "Emera would have a greater than 10% ownership interest in APUC, NE Wind and JV Holdco."

[¶26]  The intervenors argue that the Commission's interpretation of the Restructuring Act as not expressly prohibiting affiliate-type ownership of Maine electric generation assets is unreasonable and inconsistent with the intent of the Restructuring Act. They contend that the Commission's interpretation is contrary

to the plain language of section 3204(5) and violates rules of statutory interpretation.

[¶27] The intervenors are correct that the Act unambiguously required that owners of T&D utilities initially divest themselves of the generation assets that they owned. *See* 35-A M.R.S. § 3204(1) (requiring, with some exceptions, that "on or before March 1, 2000, each investor-owned electric utility shall divest all generation assets and generation-related business activities"). The Act does not, however, expressly prohibit a parent company from owning both generation and T&D assets after divestiture. Instead, the Act prohibits any *T&D utility* from having certain interests in generation assets: "**Ownership of generation prohibited.** Except as otherwise permitted under this chapter, on or after March 1, 2000, an investor-owned transmission and distribution utility may not own, have a financial interest in or otherwise control generation or generation-related assets." *Id.* § 3204(5).

[¶28] Thus, the statute does not expressly prohibit affiliation between a parent company that owns and operates generation assets and a T&D utility. *See id.* The Legislature used the terms "affiliate," "affiliated," or "affiliated interest" in other parts of section 3204, *see, e.g., id.* § 3204(1), (8), and in other parts of the Restructuring Act, *see, e.g., id.* §§ 3201(1), 3202(4)(A), 3205 to 3206-A, 3212(2)(C). It could easily have drafted section 3204(5) to prohibit the

owners of T&D utilities from having any "affiliation" or "affiliated interest" with generation companies after divestiture. For example, as first introduced, the bill provided that "a large, investor-owned transmission and distribution utility may not have an *affiliated interest* in a competitive generation provider." L.D. 1804 § 1 (118th Legis. 1997) (emphasis added) (proposed as section 3204(4)).[15]

[¶29] After multiple amendments, however, the Legislature chose not to use "affiliate" language in section 3204(5), but instead directed that T&D utilities "may not own, have a financial interest in or otherwise control generation or generation-related assets." 35-A M.R.S. § 3204(5). Thus, construing the plain and unambiguous language of the statute, and consistent with our prior rulings, we conclude that section 3204(5) does not explicitly prohibit *all* affiliation, as defined by the Restructuring Act, between a T&D utility's corporate owner and entities that own generation or generation-related assets. *See id.* §§ 707(1)(A), 3201(1); *Dep't of Corr.*, 2009 ME 40, ¶ 8, 968 A.2d 1047. Whether any specific proposed affiliation runs afoul of the prohibition against a T&D utility having ownership of,

---

[15] A committee amendment made three changes to the bill that are relevant to this dispute. Comm. Amend. A to L.D. 1804, No. H-568, § 3 (118th Legis. 1997). First, the amendment eliminated the language prohibiting investor-owned T&D utilities from having "an affiliated interest" in generation companies. *Id.* Second, the amendment eliminated the section entitled "**Interests in generation restricted**," which had provided that T&D utilities may not "[a]cquire or hold any financial or ownership interest in generation assets or generation-related business activities or contracts for generation." L.D. 1804, § 1 (118th Legis. 1997) (proposed as section 3204(2)); *see* Comm. Amend. A to L.D. 1804, No. H-568, § 3 (118th Legis. 1997). Third, the amendment added a subsection entitled "**Ownership of generation prohibited**" that provided that T&D utilities "may not own, have a financial interest in or otherwise control generation or generation-related assets." Comm. Amend. A to L.D. 1804, No. H-568, § 3 (118th Legis. 1997) (codified at 35-A M.R.S. § 3204(5)). The Legislature enacted the amended bill. 2 Legis. Rec. S-1124 (1997).

18

a financial interest in, or otherwise exercising control over a generator must therefore be addressed individually.

B. **Must a T&D Utility Have Control of Generation Assets or Generation-Related Assets for It to Have a "Financial Interest" in Them Pursuant to Section 3204(5)?**

[¶30] Section 3204(5) provides that, after divestiture, T&D utilities "may not own, have a financial interest in or otherwise control generation or generation-related assets." 35-A M.R.S. § 3204(5). The proposed transactions will not result in Bangor Hydro or MPS directly owning generation companies or assets. The question, therefore, is whether the Commission's approval of the proposed transactions contravenes section 3204(5) by permitting Bangor Hydro and MPS to "have a financial interest in or otherwise control" electric generation by virtue of the mutual relationship with the parent company, Emera. *See id.*

[¶31] The Commission construed "financial interest in or otherwise control" to require the T&D utility "to have some type of control over the affiliates' generation assets" for the restructuring to be barred by section 3204(5). In so doing, the Commission reasoned that "financial interest" must mean "something more than the interest that any corporate entity would have in the financial success of its affiliates." As an example, the Commission explained that such control would arise if a T&D utility "owned a subsidiary that own[ed] and operat[ed] generation assets."

[¶32]   The language of section 3204(5) is ambiguous.   Given the grammatical structure of the sentence, it is not clear whether the Legislature intended the word "otherwise" to result in the concept of control being imported into each of the first two prohibited acts: ownership and financial interest. "An agency's interpretation of an ambiguous statute it administers is reviewed with great deference and will be upheld unless the statute plainly compels a contrary result." *Competitive Energy Servs.*, 2003 ME 12, ¶ 15, 818 A.2d 1039 (quotation marks omitted).

[¶33]   Read in the context of the Act's expressly stated goals, and its limitations on relationships between and among generators and T&D utilities, however, we conclude that each of the three types of relationships set forth in section 3204(5)—to own, to have financial interest, or to otherwise control—must be interpreted to have independent meaning. *See Carrier v. Sec'y of State*, 2012 ME 142, ¶ 12, 60 A.3d 1241 (stating that, in construing a statute based on its plain meaning, we are "attempting to give all of [the statute's] words meaning"). Although the Commission interpreted the term "otherwise" to suggest that all three types of relationship required that the T&D utility have control over generation or generation-related assets, we do not interpret the statute in that manner because such a reading would run completely contrary to the goal of the act to preserve the independence of T&D utilities from generators. *See Competitive Energy Servs.*,

2003 ME 12, ¶ 18, 818 A.2d 1039 (stating that we "avoid statutory constructions that create absurd, illogical or inconsistent results" (quotation marks omitted)).

[¶34] For instance, using the Commission's interpretation, a T&D utility could own a large percentage of non-voting shares in generation or generation-related assets as long as the T&D utility did not have control of the governance of those assets. Despite the absence of controlling ownership, the T&D utility would be highly motivated to enhance the success of its asset, the generator, thus providing a competitive advantage to that generator. Such an interpretation would run entirely counter to the Act's purpose to separate T&D from generation sufficiently to ensure competition among electricity generators and developers of electricity generation projects, and prevent incentives that would favor one or more of those developers or generators over others in obtaining the services of a T&D utility.

[¶35] Because the Commission's interpretation is not reasonable when considered in light of the explicit goals of the Act, we conclude that a T&D utility may be prohibited from having a financial interest in generation assets or generation-related assets even without exercising control over those assets. We therefore hold that a T&D utility has a prohibited "financial interest" in generation assets or generation-related assets pursuant to section 3204(5) if there exists a

sufficient financial interest in the assets of a generator that the interest is likely to produce incentives for favoritism that would undermine the purpose of the Act.

[¶36]  This financial interest may, but need not, arise from a parent company's affiliate-type relationship with both T&D utilities and generation or generation-related assets.  *See* 35-A M.R.S. §§ 707(1)(A), 3201(1).  Although the statute uses language other than "affiliate," there is no indication that the Legislature thereby intended to authorize or prohibit all affiliate-type relationships between a parent company and its T&D and generation or generation-related assets.  We interpret the statute to prohibit a T&D utility from having a "financial interest" in generation or generation-related assets, which may or may not involve relationships similar to utility affiliation as defined in section 707(1)(A).  If the financial relationship is sufficient to create an incentive for the T&D utility to favor certain generation assets or generation-related assets over others, whether through affiliate-type or other relationships, the Act's prohibition comes into effect.  Thus, although a parent company of a T&D utility is not flatly prohibited from having the kind of affiliated interest defined in section 707(1)(A) with an entity possessing generation or generation-related assets, if the relationship among the entities results in the T&D utility having a financial interest that would provide an incentive to favor certain generators over others, the proposed corporate restructuring is prohibited pursuant to section 3204(5).

[¶37] In sum, we conclude that the statute requires an interpretation of section 3204(5) that is contrary to that of the Commission. *See Dep't of Corr.*, 2009 ME 40, ¶ 8, 968 A.2d 1047. The Commission's interpretation too strictly requires a financial interest that is tantamount to a controlling interest. Because the Commission misinterpreted the statute to prohibit a T&D utility's financial interest only if that interest gives the T&D utility *control* of the generation or generation-related assets, the Commission must reexamine the transactions proposed here, applying section 3204(5) as construed herein.

[¶38] Finally, the intervenors argue that the Commission did not have the authority to impose the more than fifty separate conditions, many of which appear to "re-regulate" the unregulated generation of electricity. Moreover, the imposition of this substantial number of conditions could be seen as an indication that the financial relationships between the regulated T&D utilities and the "unregulated" generators run afoul of section 3204(5). We are cognizant of our role as an appellate body, however, and we therefore decline to make such determinations. We are confident that, with guidance on the meaning of the statute, the Commission will undertake a thoughtful and thorough reexamination of the proposals to determine whether the Act permits the reorganization proposed in this case. Accordingly, we vacate the Commission's decision and remand for further consideration consistent with this opinion.

The entry is:

> Order of the Public Utilities Commission vacated. Remanded for further proceedings consistent with this opinion.

---

**On the briefs:**

Alan G. Stone, Esq., and Adam R. Lee, Esq., Skelton, Taintor & Abbott, Auburn, for appellant Houlton Water Company

Eric Bryant, Esq., Office of the Public Advocate, Augusta, for appellant Office of the Public Advocate

Andrew Landry, Esq., Anthony W. Buxton, Esq., Robert B. Borowski, Esq., and Todd J. Griset, Esq., Preti Flaherty, LLP, Augusta, for appellant Industrial Energy Consumer Group

Charles Cohen, Esq., and Mitchell M. Tannenbaum, Esq., Maine Public Utilities Commission, Augusta, for appellee Public Utilities Commission

William S. Harwood, Esq., Verrill Dana LLP, Portland, for appellees Bangor Hydro Electric Company and Maine Public Service Company

**At oral argument:**

Adam R. Lee, Esq., for appellant Houlton Water Company

Eric Bryant, Esq., for appellant Office of the Public Advocate

Anthony Buxton, Esq., for appellant Industrial Energy
Consumer Group

Charles Cohen, Esq., for appellee Public Utilities Commission

William S. Harwood, Esq., for appellees Bangor Hydro Electric
Company and Maine Public Service Company

Public Utilities Commission docket number 2011-170
FOR CLERK REFERENCE ONLY