MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2017 ME 109
Docket:         PUC-16-353
Argued:         April 11, 2017
Decided:        June 1, 2017

Panel:          SAUFLEY, C.J., and, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

CONSERVATION LAW FOUNDATION

v.

PUBLIC UTILITIES COMMISSION et al.

MEAD, J.

[¶1]  The Conservation Law Foundation appeals from an order of the Maine Public Utilities Commission approving a stipulation regarding Efficiency Maine Trust's Third Triennial Plan for energy efficiency.  CLF contends that the Commission's order and the terms of the stipulation disregard statutory mandates set forth in the Efficiency Maine Trust Act.  *See* 35-A M.R.S. §§ 10101-10123 (2015).[1]  With respect to electric energy efficiency programs, CLF argues that the Commission did not "make use of best practices across the region" when calculating avoided energy costs and selecting a discount rate,

---

[1]  Provisions of the Efficiency Maine Trust Act have amendments that became effective after the entering of the order underlying this appeal, though the amendments are not relevant in the present case.  *See* P.L. 2015, ch. 498, §§ 1, 2 (effective July 29, 2016) (codified at 35-A M.R.S. § 10109(3-A), (4) (2016)); P.L. 2015, ch. 425, §§ 1-3 (effective July 29, 2016) (codified at 35-A M.R.S. § 10111(2), (2-A) (2016)).

2

and that it failed to "consider gross efficiency savings for the purpose of determining savings that are cost-effective, reliable and achievable" as required by 35-A M.R.S. § 10110(4-A).  With respect to natural gas efficiency programs, CLF asserts that the Commission failed to identify and fund all cost-effective, reliable, and achievable natural gas energy efficiency measures as required by 35-A M.R.S. §§ 10104(4) and 10111(2).  We discern no error in the Commission's interpretation and application of these statutes and affirm its order.

## I.  BACKGROUND

### A.    Statutory Background

[¶2]  In 2009, the Legislature established the Efficiency Maine Trust "for the purposes of developing, planning, coordinating and implementing energy efficiency and alternative energy resources programs in the State," to, inter alia, promote investment in energy efficiency measures and reduce the cost of energy for Maine residents.  35-A M.R.S. § 10103(1), (1)(B)(1), (1)(D); *see generally* 35-A M.R.S. §§ 10101-10123.  To help achieve these goals, the Trust develops a detailed energy efficiency plan every three years to identify the maximum achievable cost-effective energy efficiency savings (commonly referred to by the Commission as "MACE") and programs to achieve those

savings. *See* 35-A M.R.S. § 10104(4).

[¶3]  The Commission is tasked with reviewing the plan and opening an adjudicatory proceeding, after which it must issue an order approving the plan or rejecting elements of the plan.[2]  35-A M.R.S. § 10104(4)(D).  The Commission "shall approve all elements of the triennial plan it determines to be [MACE]" and adjust gas utility and transmission and distribution (T&D) rates to provide revenue for procurement of the energy efficiency resources identified by the triennial plan. *Id.*

[¶4]  The Efficiency Maine Trust Act sets forth specific standards for the Commission's review and approval of electric energy and natural gas efficiency programs.  With respect to electric energy,

> [w]hen determining the amount of cost-effective electric energy efficiency resources to be procured under this subsection, the [C]ommission shall:

---

[2] The Legislature bestowed this authority to the Commission through numerous amendments to the Efficiency Maine Trust Act through enactment of the Omnibus Energy Act.  *See generally* P.L. 2013, ch. 369 (varying effective dates).  Prior to these amendments, the Legislature set the minimum budget for electric and natural gas efficiency programs and directed the Commission to determine whether additional funding was appropriate; if the Commission recommended an increase, it was subject to the Legislature's approval. *See* 35-A M.R.S. § 10110(4) (2014), *repealed by* P.L. 2013, ch. 369, § A-19 (effective July 1, 2015); 35-A M.R.S. §§ 10110(5) (2012), *repealed by* P.L. 2013, ch. 369, § A-21 (emergency, effective June 26, 2013); *see also* 35-A M.R.S. 10111(2) (2012), *amended by* P.L. 2013, ch. 369, § A-25 (emergency, effective June 26, 2013) (codified at 35-A M.R.S. § 10111(2) (2013)).

4

A. Consider electric energy efficiency resources that are reasonably foreseeable to be acquired by the trust using all other sources of revenue . . . ;

B. Ensure that calculations of avoided energy costs and the budget identified by the trust in its triennial plan as needed to capture all cost-effective electric energy efficiency resources are reasonable, based on sound evidence and make use of best practices across the region; and

C. Maximize total electricity savings for all ratepayers.

The [C]ommission shall consider gross efficiency savings for the purpose of determining savings that are cost-effective, reliable and achievable and shall consider both net and gross efficiency savings for the purpose of determining the appropriateness of the amount identified by the trust in its triennial plan as needed to capture all cost-effective electric energy efficiency resources.

35-A M.R.S. § 10110(4-A).

[¶5]  With respect to natural gas, the Commission "shall assess each gas utility, in accordance with the triennial plan, an amount necessary to capture all [MACE]."  35-A M.R.S. § 10111(2).

B.    The Third Triennial Plan

[¶6]  On December 17, 2015, the Trust submitted to the Commission its petition for approval of the Triennial Plan for Fiscal Years 2017-2019.  For purposes of determining the cost-effectiveness of proposed energy efficiency measures, the Trust relied on the Avoided Energy Supply Costs in New England:

2015 Report ("AESC report") to calculate avoided energy costs[3] and to select a discount rate.[4]

[¶7] Following the plan's submission, the Commission granted eleven petitions to intervene.[5] Discovery commenced in January 2016, and over the next several weeks the Commission convened a technical conference and entered protective orders for proprietary information, and the parties responded to data requests and submitted testimony.

[¶8] On February 24, 2016, the Commission staff filed a bench analysis[6] outlining its review of the Third Triennial Plan and its analysis of the cost-effectiveness of the efficiency measures identified by the Trust. The staff conducted its analysis using the Trust's MACE study and models, but adjusted

---

[3] "Avoided energy costs" refers to costs that are not incurred as a result of the implementation of electric and natural gas efficiency programs.

[4] Discount rates account for the time value of money when energy efficiency benefits accrue over time. A high discount rate reflects the policy that short-term costs and benefits are valued more than long-term costs and benefits, whereas a low discount rate reflects the policy that long-term costs and benefits are valued more than short-term costs and benefits.

[5] The intervenors were the Conservation Law Foundation (CLF); the Office of the Public Advocate (OPA); Natural Resources Council of Maine (NRCM); Northern Utilities, Inc. d/b/a Unitil; Central Maine Power Company; Summit Natural Gas of Maine, Inc.; Bangor Gas Company, LLC; Industrial Energy Consumer Group (IECG); Maine Natural Gas Corporation; Calpine Corporation; and Emera Maine. Calpine Corporation later withdrew as an intervenor.

[6] The bench analysis is "not a recommendation," but rather information "that the staff believe would be helpful to the Commission to have in the record."

6

"certain assumptions and methodological approaches" that had been used by the Trust. In particular, the staff's calculation of avoided costs used energy price forecasts from a June 2015 report that had been prepared by its consultant, London Economics International (LEI), for use in a different, unrelated Commission proceeding. The staff used the LEI forecast for its analysis because it determined that the AESC report was premised on outdated data, and that energy prices had dropped since the AESC report was released.

[¶9] The bench analysis also utilized a different discount rate than did the Trust. Though the Trust had selected a discount rate of 4.36% in the Triennial Plan, the staff used a discount rate of 8.5% (comprising a real discount rate of 6.62% and the same inflation rate of 1.88% used by the Trust). The staff based this decision on the Commission's order on the Second Triennial Plan, which explained that it was more appropriate to use a discount rate in the range of 7-10% because that was the rate the Commission typically used to evaluate benefits over long periods of time when ratepayers bear the costs of the transaction. *See Efficiency Maine Trust*, Request for Approval of Second Triennial Plan, No. 2012-449, Order at 39 (Me. P.U.C. Mar. 6, 2013).

[¶10] Another technical conference was held on March 2, 2016. Later that month, CLF and Natural Resources Council of Maine (NRCM) filed joint

rebuttal testimony, and the Trust filed rebuttal and supplemental rebuttal testimony. A hearing was held over two days in March and April 2016; meanwhile, from March to early May, the parties participated in settlement conferences. On May 25, the Trust filed a proposed stipulation regarding the Triennial Plan that was signed by the Trust; the Office of the Public Advocate (OPA); Central Maine Power Company; Emera Maine; Northern Utilities, Inc. d/b/a Unitil; Summit Natural Gas of Maine; and NRCM. Maine Natural Gas and Bangor Gas Company, LLC, did not sign the stipulation but did not oppose it. CLF and the Industrial Energy Consumer Group (IECG) were the only parties to oppose the stipulation. The stipulation addressed issues pertaining to, among other things, "the methodology and assumptions for determining the measures and amounts of energy efficiency that are [MACE]" for electric energy and natural gas conservation programs. It adopted figures and methodology from the bench analysis and reduced the total budget for energy efficiency programs.

[¶11] CLF and IECG filed oppositions to the stipulation, ultimately objecting to the reduction in the triennial budget for energy efficiency programs. IECG argued that the Commission should not have based its calculation of avoided costs on the LEI forecasts, which it asserted were flawed and not subject to discovery or cross-examination, and so reliance on the

forecasts was unreasonable. CLF asserted that the terms of the stipulation are contrary to statutory mandates because the plan's discount rate and avoided costs calculations did not reflect regional best practices, the plan failed to determine MACE on a gross basis, and the plan's natural gas savings fell substantially below the MACE potential. The Trust and OPA filed responses asserting that the content of the stipulation was consistent with applicable statutes. In June, the Commission heard oral argument concerning the competing positions.

[¶12] On July 6, 2016, the Commission issued an order approving the stipulation. The Commission found IECG's argument "unpersuasive" because the LEI forecasts were available for discovery and cross-examination. Responding to CLF's concern that the terms of the stipulation did not use regional best practices, the Commission explained: "Energy market conditions change regularly and can be volatile, and prices are difficult to predict with accuracy. For these reasons, it is important to consider the most current and available forecasts, particularly in times of rapid change in markets." It continued, "No single report . . . can claim the title of regional best practice under statute, and the Commission's decision is more reasonably informed by a variety of market information set forth in the record, including, for example[,]

the more current LEI forecasts." The Commission determined that "reliance on the AESC would ignore recent material changes in energy prices and would overstate the benefits associated with energy efficient investments," and therefore the stipulation was not flawed for its reliance on, "among other things, the LEI forecasts for the purpose of calculating avoided costs."

[¶13] Regarding the stipulation's agreement on a blended discount rate, comprising a rate of 8.5% for funds received directly from ratepayers and a rate of 4.36% for funds received from other sources, the Commission explained that CLF "has not provided any support for why the discount rate developed for the AESC constitutes a regional best practice." Furthermore, it determined that "the discount rates utilized by various New England states show[] that the states take a varied approach, and the blended rate used by the [s]tipulation falls within the varied range of discount rates utilized in the New England region." It continued, "A fully litigated case may have landed on different discount rates, but the overall result here is reasonable, in keeping with the Commission's prior findings and conclusions regarding appropriate discount rates in application to ratepayer funds, and otherwise consistent with 35-A M.R.S. § 10110(4-A)."

10

[¶14]   Concerning net versus gross cost screening, the Commission determined that the stipulation comported with the statute because the statute "directs the Commission to not only consider gross savings, but also to consider net savings to account for the effects of free-ridership and spillover."[7]

[¶15]  Finally, regarding natural gas, the Commission concluded that CLF relied on an outdated study that "is not current and would overstate potential savings due to changes in both price and load growth expectations," and explained that the approach taken in the stipulation "is reasonable, and is likely to more accurately reflect [local distribution company (LDC)] growth, which has been affected by the relatively low oil prices." The Commission also noted that the stipulation results in an overall funding level that is "robust," and would produce "a diverse portfolio of efficiency programs made available to a range of customer groups and geographic areas."

[¶16]   CLF timely appealed the Commission's order approving the stipulation.  *See* 35-A M.R.S. § 1320 (2016); M.R. App. P. 2(b)(3), 22(a).

---

[7] "Gross savings" are all savings that would result from implementation of an efficiency measure, whereas "net savings" adjusts for outside influences such as, for example, savings derived from free-riders, who would utilize an efficiency measure even without the conservation program in place.

## II. DISCUSSION

[¶17] "We review decisions of the Commission with great deference only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Taylor v. Pub. Utils. Comm'n*, 2016 ME 71, ¶ 5, 138 A.3d 1214 (quotation marks omitted). We will overturn an order of the Commission only when it "abuses the discretion entrusted to it, or fails to follow the mandate of the [L]egislature, or to be bound by the prohibitions of the constitution." *Id.* (quotation marks omitted). It is the appellant's burden to establish that the Commission has violated one of these standards. *Id.*

[¶18] When we review the Commission's interpretation of a statute that it administers and that is within its expertise, "we apply a two-part inquiry." *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 18, 90 A.3d 451 (quotation marks omitted). First, we "determine de novo whether the statute is reasonably susceptible of different interpretations and therefore ambiguous." *Id.* (quotation marks omitted). Second, "we either review the Commission's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute." *Id.* (quotation marks omitted). We are not bound by the Commission's interpretation of a statute, but "such an interpretation is entitled to deference and should be upheld unless the statute

plainly compels a contrary result." *Office of the Pub. Advocate v. Pub. Utils. Comm'n*, 2003 ME 23, ¶ 19, 816 A.2d 833 (quotation marks omitted). We have, however, overturned Commission orders that violate legislative mandates. *See id.* ¶¶ 1, 29.

A.    Statutory Mandates for Electric Energy Efficiency

1.    Mandate to "Make Use of Best Practices Across the Region"

[¶19]  CLF argues that the terms of the stipulation and the Commission's order approving the stipulation violate a statutory mandate to make use of regional best practices when calculating avoided energy costs and setting a discount rate for purposes of determining electric MACE.

[¶20]  Title 35-A M.R.S. § 10110(4-A) provides, in relevant part:

When determining the amount of cost-effective electric energy efficiency resources to be procured under this subsection, the [C]ommission shall:

. . . .

Ensure that calculations of avoided energy costs and the budget identified by the trust in its triennial plan as needed to capture all cost-effective efficiency resources are reasonable, based on sound evidence and make use of best practices across the region.

[¶21]  CLF argues that the AESC study sets forth the regional best practice to calculate avoided energy costs and set a discount rate, which is integral to

the determination of cost-effectiveness and, as a result, MACE.[8]  CLF points to record evidence that the AESC report was developed in collaboration with stakeholders from other New England states, is used by all other energy efficiency program administrators in New England, and is considered by CLF's consultant to be "extremely credible, given the contributions made to the report from all of the relevant stakeholders in New England."

[¶22]  The Commission counters that it was not required to rely exclusively on a single "best" practice because the statute effectively creates a "three-part, conjunctive test," requiring avoided energy cost calculations and the discount rate to (1) be "reasonable," (2) be "based on sound evidence," and (3) "make use of best practices across the region."  *See* 35-A M.R.S. § 10110(4-A)(B).  Accordingly, "[r]elying wholesale on the AESC would have been inconsistent with the other requirements of section 10110(4-A)." Further, the Commission asserts that even if the AESC were established to be a

---

[8] CLF also argues that the discount rate conflicts with the Trust's rules, which provide:

> The discount rate used for present value calculations shall be the current yield of long-term (10 years or longer) U.S. Treasury securities, adjusted for inflation.  The Commission may consider an alternative discount rate when characteristics of a program are inconsistent with use of long-term U.S. Treasury securities.

12 C.M.R. 95 648 380-2 § 4(A)(3) (2010).  Compliance with this rule was not addressed in the order approving the stipulation.  However, considering the discretion granted to the Commission by 12 C.M.R. 95 648 380-2 § 4(A)(3), we discern no violation of the rule.

regional best practice, it is more reasonably viewed as setting forth a methodology used to estimate avoided energy costs rather than establishing a set of specific forecast figures.

[¶23]  In analyzing this issue, we first determine whether the statute is ambiguous.  *See Cent. Me. Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451.  Looking to the plain language of section 10110(4-A), the requirement that the Commission ensure that avoided energy costs and the budget identified by the Trust in the triennial plan "make use of best practices across the region" is reasonably susceptible to more than one interpretation because it is unclear precisely how the Commission must "make use of" such practices.  It could mean, as CLF asserts, that the Commission must employ the specific practices deemed the "best" in the region; alternatively, the Commission could "make use of" best regional practices by considering them in conjunction with other factors relevant to its analysis.  The statute is therefore ambiguous, and the Commission's interpretation of the statute is entitled to significant deference.  *Houlton Water Co. v. Pub. Utils. Comm'n*, 2014 ME 38, ¶ 24, 87 A.3d 749.

[¶24]  Next, we determine whether the Commission's interpretation of the statute is reasonable.  *Id.*  The Commission's view of the statute as requiring a three-prong, blended analysis finds support in principles of statutory

construction, as the statute requires the Commission to ensure that calculations of avoided energy costs and the budget "are reasonable, based on sound evidence *and* make use of best practices across the region." 35-A M.R.S. § 10110(4-A) (emphasis added). To interpret the statute as mandating reliance solely on a regional best practice would render superfluous the requirements that calculations be reasonable and based on sound evidence. *See Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667 ("Words in a statute must be given meaning and not treated as meaningless and superfluous." (quotation marks omitted)). Moreover, if a particular practice was the "best practice across the region," but the Commission determined that it was not reasonable or based on sound evidence, it would be illogical to interpret the statute as requiring the Commission to use that practice nonetheless. *See Competitive Energy Servs., LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 18, 818 A.2d 1039 ("[W]e avoid statutory constructions that create absurd, illogical or inconsistent results." (quotation marks omitted)).

[¶25]  The approach taken in the stipulation adopts the avoided costs predictions from the bench analysis, which used the LEI forecasts to calculate avoided costs. The record reflects that the Commission considered the AESC report, but ultimately determined that its decision was "more reasonably

16

informed by a variety of market information set forth in the record," including the "more current LEI forecasts," because the AESC does not account for recent energy price changes and would thus overstate energy efficiency investment benefits. The Commission's analysis was reasonable and in accordance with section 10110(4-A), and therefore we will not disturb its conclusion.

[¶26] The Commission contends that the same three-prong test applies to its selection of a discount rate. The stipulation applies a blended discount rate comprising a discount rate of 8.5% for funds collected by the utilities from ratepayers and 4.36% for funds received from other sources. In the order approving the stipulation, the Commission noted that New England states take "a varied approach" to discount rates and concluded that this blended rate was reasonable "in keeping with the Commission's prior findings and conclusions regarding appropriate discount rates," and consistent with the requirements of section 10110(4-A). In its order, the Commission found that there was no support for CLF's contention that the discount rate developed for the AESC constitutes a best regional practice, and it noted that the blended discount rate falls within the range of other New England states.[9]

---

[9] The Commission had evidence that other New England states' discount rates are as follows: Connecticut, 7.43%; New Hampshire, 2.46%; Rhode Island, 1.15%; Massachusetts, 0.55%; and Vermont, 3.00%.

[¶27] Here also, the Commission's interpretation and application of the statute with respect to the determination of the discount rate were reasonable. Accordingly, we conclude that the Commission did not violate a statutory mandate when it approved the stipulation.

2.    Mandate to Consider Gross Efficiency Savings

[¶28]    The stipulation provides that in determining electric MACE, "[b]enefit-to-cost ratios will be determined on a net basis." CLF argues that this conflicts with 35 M.R.S. § 10110(4-A), which provides:

> The [C]ommission shall consider gross efficiency savings for the purpose of determining savings that are cost-effective, reliable and achievable and shall consider both net and gross efficiency savings for the purpose of determining the appropriateness of the amount identified by the trust in its triennial plan as needed to capture all cost-effective electric energy efficiency resources.

This statute, CLF argues, "unambiguously directs the Commission to make two separate and distinct determinations, first with respect to what constitutes electric MACE, and second regarding the surcharge on ratepayers needed to fund the capture of electric MACE." The Commission argues that the terms of the stipulation are not contrary to the statute because they are consistent with the Commission's approach to determine MACE on a net basis for setting the level of ratepayer funding and on a gross basis for allowing the Trust to pursue savings that are not funded with ratepayer money.

[¶29]  We again begin by determining whether section 10110(4-A) is ambiguous and, if it is, whether the Commission's interpretation of the statute was reasonable.  *See Cent. Me. Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451.  The plain language of the statute does not specify how the Commission must "consider" gross savings in determining MACE.  However, both the Commission and CLF assert that section 10110(4-A) effectively codified the Commission's approach from its order regarding the Second Triennial Plan, where the Commission noted that the Trust had calculated benefit-cost ratios and made MACE determinations using gross savings figures but used net savings figures to determine what measures and programs would be a cost-effective use of ratepayer funds.  *See Efficiency Maine Trust*, Request for Approval of Second Triennial Plan, No. 2012-449, Order at 41-44 (Me. P.U.C. Mar. 6, 2013).

[¶30]  Based on the statute's language, we conclude that it is ambiguous. The statute is not clear as to how or to what extent that the Commission must "consider" gross savings for the purpose of determining MACE, and the statute could be reasonably construed to have more than one interpretation.  We thus consider whether the Commission's interpretation of the statute was reasonable, "according great deference to [its] interpretation."  *Houlton Water Co.*, 2014 ME 38, ¶ 24, 87 A.3d 749 (quotation marks omitted).

[¶31]  In the order approving the stipulation, the Commission explained that the stipulation complies with the statute, "which directs the Commission to not only consider gross savings, but also to consider net savings to account for the effects of free-ridership and spillover."  It noted that the Legislature "effectively codifie[d] how, in its order approving the Second Triennial Plan, the Commission treated the question of whether to screen for cost-effectiveness on a net or gross basis," which was to "screen[] measures to be funded with ratepayer dollars on a net basis."  *See Efficiency Maine Trust*, Request for Approval of Second Triennial Plan, No. 2012-449, Order at 41-44 (Me. P.U.C. Mar. 6, 2013).

[¶32]  The Commission's interpretation of the statute is reasonable. Determining benefit-to-cost ratios on a net basis is consistent with the Commission's past approach and with the requirements of section 10110(4-A). *See Office of the Pub. Advocate*, 2003 ME 23, ¶ 19, 816 A.2d 833.  The Commission considered calculations of gross savings to determine MACE; however, the language of the statute does not require that the Commission make an independent calculation of MACE based exclusively on gross savings, separate and apart from its determination of the appropriateness of the amount

needed to capture all MACE. Accordingly, this aspect of the stipulation is not contrary to the statute.

B.     Mandate to Capture All Natural Gas MACE

[¶33]  Title 35-A M.R.S. § 10111(2) provides that the Commission "shall assess each gas utility, in accordance with the triennial plan, an amount necessary to capture all [MACE]." *See also* 35-A M.R.S. § 10104(4)(D) (stating that the Commission shall "approve all elements of the triennial plan it determines to be [MACE]"). CLF argues that the Commission erroneously relied on historic data instead of projections of natural gas MACE, and that the approach taken in the stipulation falls short of funding all natural gas MACE as required by the statute. CLF urges that the Commission should have relied on a study prepared in 2014 by a consultant for the Trust to investigate natural gas energy efficiency opportunities in Maine.

[¶34]  In its order, the Commission explained that the study relied on by the Trust was "dated" and "would overstate potential savings due to changes in both price and load growth expectations since 2014." It concluded that the approach taken in the stipulation regarding natural gas MACE "is reasonable, and is likely to more accurately reflect LDC growth, which has been affected by the relatively low oil prices."

[¶35]  The Commission has discretion to approve what it determines to be MACE, and we defer to the Commission's technical expertise. *See* 35-A M.R.S. § 10104(4); *Office of the Pub. Advocate v. Pub. Utils. Comm'n*, 2015 ME 113, ¶ 15, 122 A.3d 959.  Although the Trust had a different projection of what constituted natural gas MACE, the Commission expressed valid concerns about the study relied upon by the Trust and determined that the approach taken in the stipulation, which reflected recent market changes, was superior. Furthermore, the terms of the stipulation provide that the natural gas budget is adjustable each year depending on increased customer and load growth.

[¶36]  We conclude that it was not erroneous for the Commission to base its determination of natural gas MACE on historical data rather than on future projections, and that the Commission did not abuse its discretion by approving the stipulation.

The entry is:

Judgment affirmed.

Emily K. Green, Esq. (orally), Sean Mahoney, Esq. and Greg Cunningham, Esq., Conservation Law Foundation, Portland, for appellant Conservation Law Foundation

Amy B. Mills, Esq. (orally), and Mitchell M. Tannenbaum, Esq., Maine Public Utilities Commission, Augusta, for appellee Public Utilities Commission

Catherine R. Connors, Esq., and Liam J. Paskvan, Esq., Pierce Atwood, LLP, Portland, and Patrick Taylor, Esq., Unitil Service Corp., Hampton, New Hampshire, for appellee Northern Utilities, Inc.

Janet T. Mills, Attorney General, and Christopher C. Taub, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Efficiency Maine Trust

Public Utilities Commission docket number 2015-00175
FOR CLERK REFERENCE ONLY