MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:      2015 ME 113
Docket:        PUC-14-414
Argued:        June 18, 2015
Decided:       August 13, 2015

Panel:         SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HJELM, JJ.

OFFICE OF THE PUBLIC ADVOCATE et al.

v.

PUBLIC UTILITIES COMMISSION et al.

JABAR, J.

[¶1]  The Maine Office of the Public Advocate (OPA) and Bucksport Mill, LLC, appeal from an order of the Maine Public Utilities Commission approving an alternative rate plan (ARP) for Bangor Gas Company, LLC.  They argue that the Commission erred by (1) calculating the ARP initial rate base by utilizing an unimpaired, "original cost" valuation of Bangor Gas's assets rather than the impaired "acquisition cost" incurred by Bangor Gas's parent company; and (2) including in its calculation of Bangor Gas's revenue requirement a portion of the utility's regulatory proceeding expenses amortized over five years.  We affirm the Commission's order.

## I.  BACKGROUND

[¶2]  The following facts were found by the Commission and are supported by the record.  Bangor Gas is a wholly-owned subsidiary of Penobscot Natural Gas

Company, Inc. (Penobscot), which in turn is currently owned by Energy West, Inc. Bangor Gas provides residential, commercial, and industrial gas service to approximately 4,000 customers in Bangor, Brewer, Old Town, Veazie, Bucksport, Herman, and Orono. It is also the sole natural gas service provider for Bucksport Mill, formerly known as Verso Bucksport, LLC., and Verso Corporation.[1]

[¶3] Bangor Gas was first authorized to provide service to the greater Bangor area as a start-up gas utility in 1998. At that time, Bangor Gas and its parent company, Penobscot, were owned by Sempra Energy, LLC (Sempra). Recognizing that the utility was a start-up with large front-end expenses and entering a highly competitive market, the Commission approved Bangor Gas's original alternative rate plan (ARP) for a term of ten years. The utility's rates were established by reference to the cost of alternative fuels at the time and to other utilities' rates. The rate plan included an earnings-sharing mechanism, which required Bangor Gas to return to ratepayers fifty percent of any earnings in excess of fifteen percent of the utility's cumulative return on equity. The earnings-sharing mechanism was imposed to ensure that Bangor Gas would not realize excessive earnings over the course of the ten-year rate plan.

---

[1] Verso Corporation was originally a named party in this matter. By our order dated February 18, 2015, Verso Bucksport, LLC was substituted as a party in place of Verso Corporation, and Verso Bucksport later changed its name to Bucksport Mill, LLC.

[¶4] Much of Bangor Gas's service infrastructure, including its gas transmission and distribution system, was installed before 2007, when Sempra owned the utility. Sempra made substantial capital investments in Bangor Gas's plant through the end of 2006. However, Bangor Gas was not profitable and, after it lost one of its largest customers, Sempra sought to sell it.

[¶5] In December 2006, Energy West offered to acquire Penobscot and Bangor Gas from Sempra by purchasing Penobscot's stock for approximately $500,000. The pending sale, as well as Bangor Gas's lack of profitability, triggered an internal "impairment analysis" of Bangor Gas's assets.[2] Pursuant to generally accepted accounting principles, Bangor Gas considered Energy West's $500,000 offer to represent the fair value of Bangor Gas's assets. This analysis resulted in Bangor Gas "writing down" the book value of its assets to zero in December 2006 and recording, for accounting purposes, an impairment loss[3] of approximately $38 million.

[¶6] Sempra formally accepted Energy West's offer in January 2007. The Commission approved the sale and reorganization by order dated November 21,

---

[2] Pursuant to Statement of Financial Accounting Standards No. 144, an "impairment analysis" is a method whereby an entity routinely reviews its own long-lived assets to determine the value of those assets for the purposes of the company's internal balance sheet. As occurred in this case, a pending sale may also trigger "special impairment testing."

[3] When an impairment analysis indicates that the company's asset is worth less than the value recorded on the company's balance sheet, the company records an impairment loss by writing down the value of that asset on the balance sheet to the lower market value.

4

2007. At the same time, the Commission extended Bangor Gas's ARP for three years, but increased the earnings-sharing trigger to a thirty percent cumulative rate of return, to be calculated from the date of sale so that any losses or profits under Sempra's ownership would be ignored.

[¶7] At the time of Energy West's acquisition of Bangor Gas, several sections of the utility's pipelines had not yet been connected to supply sources, and thus were not in service supplying natural gas to customers. After Energy West's acquisition, Bangor Gas put those sections into service, added to its infrastructure, and grew its customer base.

[¶8] On December 26, 2012, Bangor Gas filed a petition to renew its ARP for a period of ten years.[4] OPA and Bucksport Mill filed petitions to intervene, which the Commission granted.[5] Over the course of several months, the Commission held numerous technical conferences and hearings, and the parties filed data disclosures and direct and rebuttal testimony. Bangor Gas presented evidence that its then-current rates were among the lowest gas utility rates in Maine, and that with those rates and its retained earnings, the company could not

---

[4] In its petition, Bangor Gas requested that the Commission continue its then-current rate plan pending consideration of the petition. The Commission denied Bangor Gas's request, finding that, pursuant to 35-A M.R.S. § 4706 (2014), it had to conduct a revenue requirement and earnings analysis before renewing the rate plan.

[5] The Commission also granted petitions to intervene filed by several towns and the University of Maine, none of which are participating in this appeal.

grow or attract new capital. It also presented evidence that it has "significant growth potential if [it] continue[s] to be positioned as a start-up . . . operating under an [ARP]."

[¶9] Bangor Gas did not initially file a revenue requirement calculation with the Commission, nor did it request regulatory proceeding expenses in its initial petition. It did, however, request regulatory proceeding expenses in its February 2014 rebuttal testimony, proposing that the expenses be amortized at $147,424 annually.

[¶10] The Commission conducted a cost-of-service and revenue requirement analysis pursuant to a traditional rate-setting methodology in order to evaluate the reasonableness of the ARP's starting point rates, *see* 35-A M.R.S. § 4706(3) (2014), and, on September 8, 2014, it issued an order authorizing Bangor Gas's ARP for a term of seven years with no change in its then-existing rates.

[¶11] The Commission rejected OPA's argument that the rate base should reflect the impaired value of Bangor Gas's assets—the $500,000 for which Energy West acquired the company in 2007—finding that this impaired "book value" "would not accurately reflect the current use of the utility's assets." Instead, the Commission found that Bangor Gas's rate base was properly calculated utilizing

6

the asset's original cost of approximately $38 million.[6]  The Commission further found that the rate base calculation proposed by OPA and Bucksport Mill "would open the door to wide fluctuations in the value of utility assets driven by market changes, with corresponding fluctuations in rates."  It determined that Bangor Gas's rates were just and reasonable; would "continue to contribute to [Bangor Gas's] success in attracting new customers"; would allow it to continue investing in its infrastructure; and would provide stable rates for natural gas customers.

[¶12]    Regarding regulatory proceeding expenses, the Commission acknowledged in its order that Bangor Gas did not comply with the filing requirements of 9 C.M.R. 65 407 850-1 to -3 §§ 1-3 (1999), but allowed "50% of Bangor Gas's rate case expense to be included in the revenue requirement, normalized over a five-year period, which results in an annual expense of $40,000."

[¶13]  OPA and Bucksport Mill appeal from the Commission's order.  *See* 35-A M.R.S. § 1320 (2014); M.R. App. P. 2(b)(3).

---

[6] The Commission calculated Bangor Gas's rate base, utilizing the depreciated original cost value of the utility's assets, to be $36,243,901.  It calculated Bangor Gas's revenue requirement to be $8,702,104.  The Commission further found that its revenue requirement calculation, utilizing the depreciated cost of Bangor Gas's plant when first put into service, indicated a revenue shortfall that would support *increasing* the utility's rates—an outcome, the Commission noted, that no party had sought.

## II.  DISCUSSION

A.     Property Valuation

[¶14]  OPA and Bucksport Mill contend that the Commission exceeded its statutory authority by valuing Bangor Gas's assets based on Sempra's original investment of $38 million, rather than on Energy West's acquisition cost of $500,000, and that the valuation error caused it to erroneously determine that the ARP base rate was just and reasonable.  *See* 35-A M.R.S. §§ 303, 4706 (2014). The Commission and Bangor Gas argue that the Commission properly determined that the ARP rates were just and reasonable by reference to the original cost of Bangor Gas's assets that are used or required to be used in providing natural gas service to the public.  *See* 35-A M.R.S. § 303.

[¶15]  We review decisions of the Commission deferentially, and will disturb a decision "only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution."  *Houlton Water Co. v. PUC*, 2014 ME 38, ¶ 24, 87 A.3d 749 (quotation marks omitted); *Office of the Pub. Advocate v. PUC*, 2003 ME 23, ¶ 19, 816 A.2d 833 ("Although the Commission's interpretation of a statute that it administers is not conclusive or binding on us, such an interpretation is entitled to deference and should be upheld unless the statute plainly compels a contrary result.") (quotation marks omitted); *New England Tel. & Tel. Co. v. Pub. Utils.*

8

*Comm'n*, 390 A.2d 8, 15 (Me. 1978) (explaining that we defer to the Commission's technical expertise and do not "review the Commission's findings of fact and seek to determine what rates are reasonable and just," but intervene only on questions of law).

[¶16] Pursuant to 35-A M.R.S. § 4706(1), the Commission may authorize an ARP for a gas utility in order "to promote efficiency in operations, create appropriate financial incentives, promote rate stability and promote equitable cost recovery" for the utility. When authorizing an ARP, the Commission has the statutory obligation to ensure that the rates resulting from the ARP are "just and reasonable." *Id.* § 4706(3). Thus, "[p]rior to the adoption of a new or replacement alternative rate plan or renewal of any existing alternative rate plan, the commission shall, in order to ensure that rates at the starting point of the plan are just and reasonable, conduct a revenue requirement and earnings review pursuant to the standards of [35-A M.R.S. § 301 (2014)]." *Id.* In determining a just and reasonable rate base pursuant to section 301, the Commission must "provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms." 35-A M.R.S. § 301(4)(A).

[¶17] In establishing a utility's rate base, the Commission must fix a "reasonable value" upon all of the utility's property that "is used or required to be

used in its service to the public," in order to ensure a "fair return on that property." 35-A M.R.S. § 303. Section 303 further provides:

> In fixing a reasonable value, the commission shall give due consideration to evidence of *the cost of the property when first devoted to public use* and *the prudent acquisition cost to the utility*, less depreciation on each, and any other material and relevant factors or evidence, but the other factors *shall not include current value*.

(Emphasis added.)

[¶18] In its property value determination, the Commission was statutorily required to give due consideration to the factors set out in section 303. However, the statute plainly does not mandate one valuation methodology over another. *See Trask v. PUC*, 1999 ME 93, ¶ 7, 731 A.2d 430 ("When we construe a statute, we give effect to the Legislature's intent[,] [which] is ordinarily gleaned from the plain language of the statute itself. Such plain meaning will be applied so long as it does not lead to an absurd, illogical, or inconsistent result.") (quotation marks omitted) (citation omitted). Further, the statute gives the Commission broad discretion to consider "any other material and relevant factors or evidence," except current value, in setting a reasonable value for the utility's assets for ratemaking purposes.

[¶19] In *Central Me. Power Co. v. Pub. Utils. Comm'n*, 150 Me. 257, 262 (1954), we explained the requirement that the Commission give "due consideration" to the applicable statutory factors in determining the fair value of property for ratemaking purposes as follows:

> The requirement that the Commission give "due consideration" to evidence tending to establish any factor of fair value does not mean that the Commission is not the judge of the weight to be given to the proffered evidence. Nor does it mean that equal weight must be given to each factor proven. The Commission may not proceed with a closed mind and no disposition to be convinced by unimpeachable evidence. "Due consideration" requires at least reasonable and fair consideration, and once a factor is well proven, not only must the Commission give consideration to it, but such factor must find reflection in the finding of value . . . . [A]rbitrary and capricious disregard by the Commission of a factor established by legislative mandate, or of evidence tending to prove such a factor, is reversible error.

(Quotation marks omitted) (citation omitted). We held that the Commission's statement that it gave "very little consideration to [acquisition cost] in the rate base" did not mean that the Commission failed to give due consideration to that factor as required by the statute. *Id*. at 267. Rather, we held that the Commission exercised its discretion in giving the factor little weight in its value determination because it found that the acquired property had since been "substantially retired." *Id*.

[¶20] Further, we explained that "original cost" is "the depreciated original cost of property now existing and devoted to the public use[,] . . . taken as of the time when the property was first devoted to the public use, *whether that event occurred when it was in the hands of this Company or a former owner*." *Id*. at 264 (emphasis added). "Prudent acquisition cost," we explained, is "the difference, most often an excess, between the original cost when first devoted to public service

and the amount invested upon acquisition. This factor brings into focus what the Company *prudently* invested in the property and takes into account that [business] property . . . often demands a higher price than its original cost." *Id*. at 266.

[¶21] Here, the Commission gave due consideration in its order both to evidence of Energy West's prudent acquisition costs and to evidence of the cost of Bangor Gas's property when Sempra first devoted the property to public use. Consistent with its statutory authority, the Commission rejected the acquisition cost factor and accepted the original cost factor as the more reasonable value on which to base Bangor Gas's base rates and resulting return on equity. In so concluding, the Commission gave careful consideration to Bangor Gas's productivity and its ability to attract capital and realize a fair return on equity, and to policy concerns for rate stability.

[¶22] OPA and Bucksport Mill argue that the Commission erroneously considered the "current value" of Bangor Gas's assets in direct contravention of section 303, citing the order's references to the current use and revenue producing abilities of the utility's assets. Contrary to the appellants' contention, the Commission did not discuss Bangor Gas's facilities in order to determine their current or fair market value; rather, consistent with the statutory mandate, it set out to determine a reasonable value for Bangor Gas's property that would allow the utility to realize a fair return on equity in light of its current operations and service

capacity. After considering all the evidence and relevant statutory factors, the Commission determined that the original cost valuation more accurately reflected the reasonable value of the property that Bangor Gas uses in providing its customers natural gas, and therefore the property on which it is entitled a fair return.[7] The Commission did not abuse its discretion or exceed its statutory authority in accepting that valuation for Bangor Gas's property.

B.     Regulatory Proceeding Expenses

[¶23]  OPA also argues that the Commission abused its discretion by including in its revenue requirement calculation fifty percent of Bangor Gas's regulatory proceeding expenses because there was insufficient evidence supporting the expense calculation.[8] However, because the Commission's decision to include the regulatory proceeding expenses in its revenue requirement analysis had no impact on its decision to approve the ARP, we need not address the merits of that decision.

---

[7]    Indeed, the valuation method proposed by OPA and Bucksport Mill—Energy West's 2007 acquisition cost of $500,000—might more closely reflect a "current value" assessment than does the original cost valuation; the purchase price paid in 2007 reflects a snapshot market value of the company's assets at that time.

[8]    OPA also contends that the Commission improperly "amortized" these expenses rather than "normalizing" them. Contrary to OPA's argument, the Commission's analysis is consistent with normalization and reflects the Commission's effort to normalize Bangor Gas's expenses despite an infrequent regulatory history. *See Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 634 A.2d 1302, 1304 (Me. 1993) (explaining the normalization analysis).

[¶24]   Although, as the Commission concedes, Bangor Gas did not strictly comply with the filing requirements for regulatory proceeding expenses, the utility's overall revenue requirement was otherwise fully litigated and the Commission considered "a wide array of possible rate base calculations" as supported by each parties' filings, rebuttal filings, and data request responses. Significantly, because the ARP that the Commission adopted for Bangor Gas did not change the utility's starting point rates from then-current levels, the Commission's decision to normalize a portion of Bangor Gas's regulatory proceeding expenses in its revenue requirement analysis had no impact on the ARP's ultimate starting point rates.   In other words, because the Commission decided to maintain starting point rates at then-current levels, it did not set the rate that Bangor Gas's customers would pay based on the revenue requirement figures presented by either Bangor Gas or OPA.   Rather, it considered each parties' filings in determining what revenue the utility would require and thus what rate could justly be charged to the utility's customers pursuant to a traditional rate-making methodology, and then compared that rate to the ARP starting point rates to determine whether the ARP rates were just and reasonable.   *See* 35-A M.R.S. §§ 301(4), 4706(3).

[¶25]   In its order, the Commission noted that the revenue requirement figures proposed by Bangor Gas would indicate a revenue shortfall that would

justify a rate increase, and the figures proposed by OPA would indicate a windfall that would require a rate decrease—the primary reason for the difference between the two approaches being the different property valuations in determining the rate base.  The Commission took neither route, and instead found that Bangor Gas's then-existing rates were reasonable starting point rates and did not need to be changed.  It is safe to say that this dispute over an expense item representing an insignificant portion of the revenue requirements presented by each party,[9] neither of which were used to set the utility's rates, did not affect the Commission's decision to adopt the ARP.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Timothy R. Schneider, Esq., and William C. Black, Esq., Maine Office of the Public Advocate, Augusta, for appellant Office of the Public Advocate

Todd J. Griset, Esq., and Andrew Landry, Esq., Preti Flaherty Beliveau & Pachios LLP, Augusta, and Linda M. Glover, Esq., Winstead PC, Houston, Texas, for appellant Bucksport Mill, LLC

---

[9] The additional $40,000 regulatory proceeding expense accounts for an approximate one-half-percent increase in Bangor Gas's approximately $8 million revenue requirement.

Matthew Kaply, Esq., Carol MacLennan, Esq., and Mitchell Tannenbaum, Esq., Maine Public Utilities Commission, Augusta, for appellee Public Utilities Commission

Alan G. Stone, Esq., and Benjamin J. Smith, Esq., Skelton, Taintor & Abbott, Auburn, for appellee Bangor Gas Company, LLC

**At oral argument:**

Timothy R. Schneider, Esq., for appellant Office of the Public Advocate

Andrew S. Hagler, Esq., for appellee Public Utilities Commission

Alan G. Stone, Esq., for appellee Bangor Gas Company, LLC

Public Utilities Commission case number 2012-598
FOR CLERK REFERENCE ONLY