MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2016 ME 19
Docket:       PUC-15-20
Argued:       November 3, 2015
Decided:      January 26, 2016

Panel:        SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

ED FRIEDMAN et al.

v.

PUBLIC UTILITIES COMMISSION et al.

MEAD, J.

[¶1]  Ed Friedman and others (collectively, Friedman) appeal from an order of the Maine Public Utilities Commission finding that Central Maine Power Company's (CMP) advanced metering infrastructure (AMI) system poses no credible threat to the health and safety of CMP's customers.  On appeal, Friedman contends that (1) the Commission applied an improper standard and burden of proof; (2) the determination was not supported by substantial evidence in the record; and (3) the two Commissioners serving on the panel outlined differing rationales and therefore did not concur in the decision.  We affirm the Commission's decision.

I.  BACKGROUND

[¶2]  The facts of this case were thoroughly discussed in *Friedman v. Public Utilities Commission* (*Friedman I*), 2012 ME 90, ¶ 2, 48 A.3d 794, wherein we

2

noted that the genesis of this dispute was the Commission's approval of CMP's AMI proposal in 2010. This project provided CMP customers with "smart meters" and other related devices that allowed CMP to conduct automated and remote meter readings and to communicate with customers' meters. In 2011, the Commission initiated an investigation pursuant to 35-A M.R.S. § 1302(1) (2015) after receiving multiple complaints regarding the safety of CMP's smart meters. *Friedman I*, 2012 ME 90, ¶¶ 2-3, 48 A.3d 794. Particularly, customers raised concerns about the potential health effects of radiofrequency signals (RF) emitted by smart meters. *Id.* ¶ 2. On May 19, 2011, and on June 22, 2011, the Commission issued Parts I and II of its Opt-Out Order, respectively, mandating that CMP provide alternatives for its customers who want to opt out of the smart meter program. *Id.* ¶ 3. The Commission further ordered that customers who wanted to opt out would be assessed both an initial and a monthly fee to continue to opt out of the smart meter program. *Id.* ¶ 3 n.3. The Commission made no finding regarding the safety of the smart meters. *Id.* ¶ 11.

[¶3] In July 2011, Friedman, joined by others, filed a complaint pursuant to 35-A M.R.S. § 1302(1), contending that customers should not have to pay opt-out fees and raising issues regarding the health effects of smart meters, among other things. *Friedman I*, 2012 ME 90, ¶ 4, 48 A.3d 794. The Commission dismissed the complaint because all of the issues raised had been "resolved" by the earlier

investigation and subsequent Opt-Out Orders. *Id.* ¶ 5. Friedman filed a motion for reconsideration. *Id.* After no decision was rendered on the motion, it was denied by operation of law. *Id.* On October 31, 2011, Friedman appealed. *See* 35-A M.R.S. § 1320 (2015).

[¶4] On July 12, 2012, we vacated the dismissal of Friedman's initial complaint because the Commission, in its Opt-Out Orders, explicitly declined to make findings on the health and safety of CMP's smart meters, and therefore had failed to resolve that issue. *Friedman I*, 2012 ME 90, ¶¶ 9-11, 48 A.3d 794. We remanded the case for a determination of whether smart meters pose a "credible threat" to the health and safety of CMP's customers. *Id.* ¶ 10.

[¶5] On July 24, 2012, the Commission opened an investigation as a result of our directive in *Friedman I.* *See* 35-A M.R.S. §§ 1302(1), 1303 (2015). Over the course of the following two and a half years, the Commission conducted a comprehensive investigation into the safety of smart meters, focusing on RF emitted by smart meters and other related devices. During the investigation, the Commission received and reviewed substantial quantities of evidence, including, but not limited to, expert testimony, thousands of pages of peer-reviewed studies, and reports and findings by both domestic and foreign regulatory bodies. The Commission succinctly described its approach in assessing the safety of smart meters, stating that

4

[a] safe utility practice standard should limit both short-term (acute) and long-term (chronic) risks to those risks that are reasonable in light of the context and purpose of the service and facility. Regulators should also consider the magnitude of the risk (the concentrations and strength of exposure), the probability of harm (certainty based on science, engineering and medical knowledge), and the availability of alternatives to the service or facility and mitigation techniques to reduce the magnitude and likelihood of possible harm. The utility and Commission need to consider a broad range of reasonable operational scenarios and exposure scenarios that will be experienced in considering what utility practices are safe and what risk mitigation is required to meet the safety mandate.

[¶6] At the conclusion of its investigation, the two Commissioners serving on the panel found that "AMI, including the use of smart meters, as implemented and operated by CMP, does not present a credible threat of harm to the health and safety of CMP's customers and, based on the record of this proceeding is, therefore, safe." Friedman timely appealed. *See* 35-A M.R.S. § 1320.

## II. DISCUSSION

A.    Credible Threat Standard

[¶7]    "Generally, decisions of the Commission are reviewed only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 18, 90 A.3d 451 (alterations omitted) (quotation marks omitted). The Commission must "ensure safe, reasonable and adequate service" pursuant to 35-A M.R.S. § 101 (2015). *See also* 35-A M.R.S. § 301 (2015). Consistent with

this duty, in *Friedman I* we mandated that the Commission determine whether smart meters and their associated RF constitute a "credible threat" to the health and safety of CMP customers. *Friedman I*, 2012 ME 90, ¶ 10, 48 A.3d 794. Friedman argues that "ensure" means that *any* credible evidence of a risk precludes a finding that smart meters are safe, and therefore the Commissioners impermissibly relaxed the standard by allowing some potential for harm "in light of the context and purpose of the service and facility . . . ."

[¶8] Contrary to Friedman's contention, and as the Commission noted, "[i]t is one thing to make a finding that *evidence* is credible regarding potential harm and quite another to find there is a legally *credible threat of harm*—that a credible threat of harm is in fact credible: likely and probable to result in harm." (Emphasis added.) In other words, evidence of a hypothetical future risk is not sufficient to preclude a finding that CMP satisfied its burden; rather, the threat of harm must be probable and convincing. The Commission, therefore, properly rejected Friedman's approach because it would require an impractically high threshold for ensuring safety, and as a result would render nearly all utilities unsafe. The Commission appropriately applied the credible threat standard such that it evaluated "what threat or hazard constitutes an acceptably safe level of exposure," balancing the potential for harm against the usefulness and pervasiveness of the technology at issue.

6

[¶9] Friedman also contends that the Commission improperly shifted the burden of proof as a result of its interpretation of the standard. We need not reach this issue because, as discussed *infra*, we conclude that substantial evidence in the record supports the Commission's determination that smart meters pose no credible threat to the health and safety of CMP customers. *See Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 631 A.2d 57, 62 (Me. 1993) (stating that "[b]ecause we find there is substantial evidence in the record to support the Commission's decision, we need not consider" an assertion regarding the allocation of the burden of proof); *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 414 A.2d 1217, 1236 n.10 (Me. 1980) ("Since we decide that the Commission's . . . Orders were supported by sufficient evidence affirmatively of record, we have no occasion to be embroiled in the controversy among the parties as to who may have borne either the burden of coming forward with evidence or the ultimate burden of proof.").

B.     Substantial Evidence

[¶10] "We review decisions of the Commission deferentially, and will disturb a decision only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution." *Office of the Pub. Advocate v. Pub. Utils. Comm'n*, 2015 ME 113, ¶ 15, 122 A.3d 959 (quotation marks omitted). "Our review of the

Commission's findings of fact is limited to only a determination whether they are supported by substantial evidence. If so, there is no legal error and such findings are final." *New England Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 390 A.2d 8, 36 (Me. 1978).

[¶11] Friedman argues that the Commission's finding that smart meters are safe is not supported by substantial evidence in the record. Contrary to Friedman's contention, the record is replete with evidence supporting the Commission's eighty-two-page order finding that smart meters do not pose a credible threat to the health and safety of CMP's customers under reasonable operational scenarios. Over the course of its comprehensive investigation, the Commission admitted and reviewed over one-hundred peer-reviewed scientific studies, conducted several technical proceedings where internationally renowned experts testified and were cross-examined, and took administrative notice of several documents and exposure regulations in the United States and beyond. As such, the Commission made its finding based upon a wealth of evidence.

[¶12] The evidence supporting the Commission's finding includes data that smart meters comply with RF exposure regulations promulgated by the FCC. Trilliant, the manufacturer of CMP's smart meters, had the meters tested pursuant to FCC standards, and this testing showed that the smart meters complied with FCC exposure limits even at the unrealistically close distance of twenty

8

centimeters from the meter. At average exposure three feet away from a smart meter, the exposure levels are "five orders of magnitude (roughly 100,000 times) lower than" the standards set forth by the FCC and the International Commission on Non-Ionizing Radiation Protection. Trilliant also measured peak exposures at a distance of three feet and found that the levels were "two orders of magnitude below" the relevant standards. In addition, in response to concerns about banks of smart meters—that is, meters grouped together—the FCC indicated that "based on the practical separation distance and the need for orderly communications among several devices, even multiple units or 'banks' of meters in the same location will be compliant with the public exposure limits." In assessing this evidence, the Commission noted that compliance with FCC standards was not conclusive, but considered it to be of value in making its safety determination.[1]

[¶13] The Commission's determination is also supported by extensive field-testing of smart meters. The Maine Center for Disease Control and Prevention, after reviewing studies and evidence submitted to it in 2010, concluded that "[o]ur review of these agency assessments and studies do[es] not indicate any consistent or convincing evidence to support a concern for health effects related to the use of [RF] in the range of frequencies and power used by smart meters."

---

[1] CMP contends that the standards set forth by the FCC preempt the field of radiofrequency exposure. We do not reach this issue because it is unnecessary in the context and on the record of this case.

Consistent with this conclusion, later studies by Exponent, on behalf of CMP; the Office of the Public Advocate; and the Electric Power Research Institute all suggested that smart meters comply with relevant RF exposure standards.

[¶14] In addition to field-testing, the Commission also considered numerous peer-reviewed studies, many of which focused on the effects of RF emissions from cell phones, and concluded that "there have been no studies provided or cited that even purport to indicate negative health effects from the much lower RF exposure levels from smart meters." The Commission acknowledged that there had been some evidence presented of potential future risk posed generally by RF exposure, but nonetheless concluded that the current state of the evidence was insufficient to conclude that smart meters amount to a credible threat of harm. In light of all of this evidence, along with a host of additional studies and information not discussed in detail here, we conclude that the Commission's determination is supported by substantial evidence in the record.

C.    Commissioners' Concurrence

[¶15] Pursuant to 35-A M.R.S. § 108-A (2015), a majority of the appointed Commissioners constitutes a quorum, and the decision of a quorum is the decision of the Commission. It is undisputed that a majority of Commissioners—that is, two out of three—were present and made a decision in this case. However, Friedman argues that the two Commissioners did not adequately concur in their

decision because Commissioner Littell, he alleges, required an opt-out provision as a necessary part of his safety finding, whereas Commissioner Vannoy did not.

[¶16]  Friedman relies on the following two statements in Commissioner Littell's Decision to support his assertion that the Commissioner predicated his safety finding on an opt-out provision for CMP customers: (1) "I find it is not a reasonable utility practice for CMP to fail to provide sufficient risk mitigation"; and (2) "[b]ased on the evidence reviewed herein and provided accommodations are made for those with medical treatment recommendations, CMP and analysis by other governmental and standards organizations in the record have established the relative safety of the AMI meters . . . ."

[¶17]  Other statements in the record, however, clearly dispel the notion that Commissioner Littell's concurrence was contingent on medical accommodations. For instance, the Commission's order explicitly states, under the heading DECISION, which appears prior to the individual opinions of each Commissioner, that

> [t]he concurring opinions below take a slightly different approach regarding customers with medical treatment recommendations to avoid the AMI meters.  Commissioner Littell would have CMP provide an AMI meter with [the] transmitter off as part of the safety determination while Commissioner Vannoy would not impose the requirement. *Both Commissioner Littell and Commissioner Vannoy concur that this difference in approach does not vitiate their concurrence regarding the safety of the AMI meters and network in use in Maine*.

(Emphasis added.) In very similar wording, the Commissioners reiterated that their concurrence was not affected by the differing approaches. *See Friedman et al.*, Request for Commission Investigation into Smart Meters and Smart Meter Opt-Out, Nos. 2011-00262, 2012-00412, Order at 8 n.5 (Me. P.U.C. December 19, 2014). Consistent with this, in his individual opinion, Commissioner Littell also states, "*In addition to a finding of safety*, I would concurrently adopt the low-cost and limited precautionary measures described below," and further states, "I find . . . that low-cost and no-cost risk mitigation measures are *advisable*." (Emphasis added.) Thus, when viewed in the context of the order as a whole, Commissioner Littell and Commissioner Vannoy unequivocally concurred in their determination that the CMP smart meters do not pose a credible threat to the health and safety of CMP customers.

The entry is:

Judgment affirmed.

12

**On the briefs:**

       Bruce A. McGlauflin, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellants Ed Friedman et al.

       Jordan D. McColman, Esq., Leslie E. Raber, Esq., and Mitchell M. Tannenbaum, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

       Kenneth W. Farber, Esq., Central Maine Power Company, Augusta, for appellee Central Maine Power Company

**At oral argument:**

       Bruce A. McGlauflin, Esq., for appellants Ed Friedman et al.

       Jordan D. McColman, Esq., for appellee Maine Public Utilities Commission

       Kenneth W. Farber, Esq., for appellee Central Maine Power Company

Maine Public Utilities Commission case number 2011-0262
FOR CLERK REFERENCE ONLY