MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2016 ME 71
Docket:        PUC-15-89
Argued:        March 1, 2016
Decided:       May 12, 2016

Panel:         ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.


BRUCE D. TAYLOR et al.

v.

PUBLIC UTILITIES COMMISSION et al.


GORMAN, J.

[¶1]  Bruce D. Taylor and Food & Water Watch appeal from a decision of the Public Utilities Commission conditionally approving the request of Fryeburg Water Company to execute an agreement with Nestle Waters North America Inc. providing for the lease of premises and purchase of water.[1]  Taylor and Food & Water Watch challenge certain of the Commission's procedural decisions, as well as the Commission's ultimate approval of the agreement, on several grounds, including that the agreement exceeds the scope of Fryeburg Water Company's charter authority, does not comply with certain statutory requirements, and deprives the Commission of future oversight authority.  We affirm the decision.

---

[1]  Fryeburg Water Company, the Public Utilities Commission, and the Office of the Public Advocate have filed briefs supporting the Commission's decision.

## I. BACKGROUND

[¶2]   In 2012, Fryeburg Water Company (FWC) sought Commission approval to execute an agreement with Nestle Waters North America Inc. (NWNA) for NWNA's lease of certain premises and purchase of water from FWC.[2]  In the proposed agreement, NWNA agreed to pay FWC a fixed monthly rent for the lease of a two-acre parcel of property and pumping station, and to purchase from FWC a minimum amount of water per year at the Commission-approved tariff rate.  FWC also agreed to dedicate Well #1 for NWNA's exclusive use, but retained the right to suspend NWNA's use of Well #1 if such a suspension were necessary to maintain the water supply to FWC's customers or to comply with environmental regulations.  Finally, NWNA agreed to seek additional water sources outside the existing watershed for use by FWC and FWC's customers.  The proposed agreement was for twenty-five years, with the option of four additional five-year extensions.

[¶3]   The Commission opened an investigation and commenced an adjudicatory proceeding concerning the request in October of 2012.  Taylor (a Maine resident) and Food & Water Watch (FWW) (a national non-profit consumer advocacy organization) (hereinafter, collectively, Taylor), among others,

---

[2]  Since 2008, with the Commission's approval, FWC has had a direct contractual relationship with NWNA for NWNA's lease of property and purchase of water from FWC.  Before that, beginning in 1997, NWNA purchased water from FWC through an affiliate entity, Pure Mountain Springs, LLC.

were permitted to intervene.  *See* 35-A M.R.S. § 1303 (2015).  The parties engaged in discovery and settlement efforts for the next two years, during which another intervenor, Clifford R. Hall (a Maine resident), attempted to subpoena information from NWNA regarding its prior contractual arrangements with FWC and other suppliers in New England.  The Commission later granted NWNA's request to vacate the subpoena as untimely and overbroad.

[¶4]  The Commission conducted a final evidentiary hearing in September of 2013.[3]  By decision dated November 21, 2014, the Commission approved the proposed agreement, conditioned on the removal of an exclusivity provision prohibiting FWC from selling untreated water to any other person or entity, which the Commission determined was in violation of 35-A M.R.S. § 703(1) (2015).  The Commission otherwise determined that the agreement satisfied all applicable statutory criteria.  Taylor timely appeals from the Commission's denial of his motion for reconsideration.  S*ee* 35-A M.R.S. § 1320 (2015); 9 C.M.R. 65 407 110-12 § 11(D) (2013).

---

[3] Based on multiple commissioners' decisions to recuse themselves from this matter, and the resulting absence of a quorum to issue a decision, the Legislature enacted P.L. 2013, ch. 554, § 1 (effective Apr. 17, 2014) (codified at 35-A M.R.S. § 108-B (2015)), allowing the Governor to appoint temporary commissioners if the Commission is otherwise unable to maintain a quorum. *See* 35-A M.R.S. § 108-A (2015) (requiring that Commission decisions must be issued by a quorum, that is, "[a] majority of the duly appointed commissioners").  Pursuant to section 108-B, Governor Paul R. LePage appointed two retired state court justices as temporary commissioners to decide the matter.

4

## II. DISCUSSION

[¶5]    Taylor argues that the Commission erred by concluding that the proposed agreement satisfies all applicable statutory criteria.[4] We review decisions of the Commission with great deference "only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record."[5] *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 18, 90 A.3d 451 (alteration omitted) (quotation marks omitted).  We "will disturb a decision only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution." *Office of the Pub. Advocate v. Pub. Utils. Comm'n*, 2015 ME 113, ¶ 15, 122 A.3d 959 (quotation marks omitted).  It is the appellant's burden to establish on appeal that the Commission's action violates one or more of these standards. *Cent. Me. Power*, 2014 ME 56, ¶ 19, 90 A.3d 451.

---

[4]   Contrary to Taylor's additional contention—that it was error to vacate the subpoena issued to NWNA—the Commission acted within its authority in concluding that the subpoena was not requested in a timely manner and would cause delay in obtaining an efficient resolution of the matter. *See* 5 M.R.S. § 9060 (2015); 35-A M.R.S. § 1304(3) (2015); 9 C.M.R. 65 407 110-6 § 8(C)(1), (2)(c) (2013); *Cent. Me. Power Co. v. Me. Pub. Utils. Comm'n*, 395 A.2d 414, 424-26 (Me. 1978).  For the same reasons, the Commission also committed no error by denying Taylor's request for an additional hearing in the matter after the temporary commissioners were appointed.

[5]   We decline Taylor's invitation to evaluate the Commission's decision with less deference based on the background of the temporary commissioners appointed to decide the matter.  We have never conditioned deference to the Commission or any other agency on the qualifications and experience of the particular commissioners whose decision is being challenged, and have rejected similar arguments against applying deference to other agency decisions.  *See, e.g., S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶¶ 5-7, 868 A.2d 210; *Mar. Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶¶ 8-9, 767 A.2d 812.

[¶6]  "When reviewing an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise," we first determine de novo whether the statute is ambiguous, i.e., "reasonably susceptible of different interpretations."  *Id.* ¶ 18 (quotation marks omitted).  If the statute is not ambiguous, we "plainly construe the unambiguous statute."  *Id.* (quotation marks omitted).  If the statute is ambiguous, we "review the Commission's construction of the ambiguous statute for reasonableness."  *Id*. (quotation marks omitted). "Although the Commission's interpretation of a statute that it administers is not conclusive or binding on us, such an interpretation is entitled to deference and should be upheld unless the statute plainly compels a contrary result." *Office of the Pub. Advocate*, 2015 ME 113, ¶ 15, 122 A.3d 959 (quotation marks omitted). We apply the same standard to the Commission's interpretation of its own technical regulations, as long as those regulations comply with the relevant statutes. *Cent. Me. Power*, 2014 ME 56, ¶ 19, 90 A.3d 451.

[¶7]  On the merits of the conditional approval, Taylor first argues that the proposed agreement exceeds the scope of FWC's authority pursuant to its legislative charter.[6]  The Legislature enacted FWC's charter by private and special

---

[6]  To the extent Taylor argues that FWC's actions were beyond the scope of its authority pursuant to the common law corporate ultra vires doctrine, that doctrine was abrogated by the enactment of the Maine Business Corporation Act.  *See* 13-C M.R.S. § 304 (2015); Zimpritch, Maine Corporation Law and Practice § 3.3 at 65 (3d ed. 2015).  Section 304 prohibits any challenge to a corporation's power to act except in one of three circumstances—in a shareholder proceeding; in a proceeding brought by the

6

law in 1883; the charter provides for the creation of "a corporation by the name of the Fryeburg Water Company, for the purpose of conveying to the village of Fryeburg and vicinity, a supply of pure water for domestic and other purposes." P. & S.L. 1883, ch. 268, § 1 (effective Feb. 26, 1883) (apparently reenacting in full the original charter, P. & S.L. 1879, ch. 177 (effective Feb. 28, 1879)), *as amended by* P. & S.L. 1917, ch. 3; P. & S.L. 1969, ch. 74. This language, Taylor contends, prohibits FWC from allowing water from an aquifer to be extracted in bulk and shipped outside FWC's territory for bottling and reselling, and from selling untreated water. Specifically, Taylor argues that the proposed agreement violates the charter because the charter (1) allows FWC to sell water only to "public customers" in the provision of utility service, and NWNA is not a "public customer" for whom FWC provides any utility service; (2) precludes FWC from selling water on special terms not available to the general public, and NWNA has special terms in the proposed agreement; (3) precludes the removal of purchased water from FWC's district, and NWNA proposes to remove water in bulk from

corporation against a director, officer, employee, or agent; or in a judicial dissolution proceeding brought by the Attorney General. 13-C M.R.S. § 304(1), (2). The present matter qualifies for none of these exceptions.

FWC's charter is a legislative enactment, however, and we read Taylor's argument as asserting that FWC violated a statute by exceeding its charter authority, rather than as an ultra vires argument that FWC violated its own corporate documents.

FWC's district for bottling and reselling elsewhere; and (4) precludes FWC from selling any untreated water, and NWNA proposes to purchase untreated water.

[¶8] As a legislative enactment, we first examine the plain language of the charter as we would any other statute. *See Cent. Me. Power*, 2014 ME 56, ¶ 18, 90 A.3d 451. None of Taylor's interpretations is supported by the unambiguous language of the charter; the charter makes no mention of public customers, special terms, the removal of water, the bottling or reselling of water, or untreated[7] or unsafe water. *See id*. Rather, the charter's language is broad; it discusses not just Fryeburg, but the "vicinity," and it mentions the supply of water not just for domestic purposes, but for "other purposes" as well. P. & S.L. 1883, ch. 268, § 1.

[¶9] Taylor also makes several arguments regarding the failure of the proposed agreement to satisfy the statutory criteria necessary for approval, namely, 35-A M.R.S. § 309 (2015), regarding tariff rates; 35-A M.R.S. §§ 702, 703 (2015), regarding special contracts; and 35-A M.R.S. § 1101 (2015), regarding leases.

---

[7] As the Commission determined, although the charter does contain the phrase "pure water," the charter does not, nor does any other authority, define "pure water" according to the current water quality standards of either the federal Clean Water Act, 33 U.S.C.S. §§ 1251-1388 (LEXIS through PL 114-146, approved 4/19/16), which, in its earliest incarnation, was enacted almost seventy years *after* FWC's charter was adopted, Pub. L. No. 80-845, 62 Stat. 1155 (1948), or Maine's safe drinking water statute, 22 M.R.S. §§ 2611-2617 (2015), which was enacted more than ninety years after FWC's charter, *see* P.L. 1975, ch. 751, § 4 (effective Apr. 1, 1977). Furthermore, even if the language were ambiguous, the Commission's interpretation of that language is reasonable and we therefore decline to disturb the Commission's conclusion as to FWC's charter authority. *See Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 18, 90 A.3d 451.

8

[¶10]  Section 309 provides, in pertinent part,

> Except as otherwise provided in section 703, it is unlawful for any public utility to charge, demand, collect or receive for any service performed by it within the State or for any service in connection with that performance, a greater or lesser compensation than is specified in such printed schedules as may at the time be in force, or to demand, collect or receive any rate, toll or charge not specified in the schedules.  The rates, tolls and charges named in the schedule are the lawful rates, tolls and charges until they are changed as provided in this Title.

35-A M.R.S. § 309(1).  This rate, which is established periodically by the utility and approved by the Commission, is called the tariff rate.  Johnson, *Maine Regulation of Public Utilities* 105 (2008); *see* 35-A M.R.S. § 304 (2015).  Thus, section 309 requires utilities to charge the tariff rate to all customers unless section 703 provides an exception.

[¶11]  Section 703 echoes section 309's provision for charging the tariff rate:

> No person may knowingly solicit, accept or receive any rebate, discount or discrimination in respect to any service rendered, or to be rendered by a public utility, or for any related service where the service is rendered free or at a rate less than named in the schedules in force, or where a service or advantage is received other than is specified.

35-A M.R.S. § 703(1); *see* 35-A M.R.S. § 702(1) ("It is unlawful for a public utility to give any undue or unreasonable preference, advantage, prejudice or disadvantage to a particular person.").  Section 703(3-A) provides for an exception to the requirement of tariff rates in the case of "[s]pecial contracts" as follows:

"A public utility, subject to the commission's approval, may make a contract for a definite term for its product or service, but the published rates for the product or service may not be changed during the term of the contract without the commission's consent." 35-A M.R.S. § 703(3-A). In sum, a public utility generally must charge all customers its approved tariff rate, except as to a special contract approved by the Commission pursuant to section 703(3-A). The statutes and regulations otherwise provide no guidance regarding by what standard a "[s]pecial contract" is reviewed or approved, and are therefore ambiguous on that basis. 35-A M.R.S. § 703(3-A).

[¶12] There is no dispute that the proposed agreement provides that, when NWNA purchases water from FWC, it will pay *at least* the tariff rate. Recognizing that fact, Taylor is not challenging the proposed agreement as affording NWNA a rate benefit. Instead, Taylor argues that the agreement could violate these statutes by allowing NWNA to pay an amount *above* the tariff rate because NWNA is taking untreated water for the same price as treated water, and because NWNA could elect to take less than the minimum amount of water while still paying for the minimum amount of water. The Commission concluded that because the proposed agreement could in no way result in a rate benefit to NWNA, the agreement satisfied section 703, which only prohibits the rendering of service for "free or at a rate *less than* named in the schedules in force." 35-A M.R.S. § 703(1)

(emphasis added); *see* 35-A M.R.S. § 702(1) (providing that only "undue or unreasonable preference, advantage, prejudice or disadvantage" constitutes "[u]njust discrimination"). This is a reasonable interpretation of the Commission's own statutes and regulations and is not contradicted by any statutory or constitutional authority. We therefore uphold this portion of the Commission's decision. *See Cent. Me. Power*, 2014 ME 56, ¶ 18, 90 A.3d 451.

[¶13] Title 35-A M.R.S. § 1101(1)(A) provides that a public utility must get Commission approval to "[s]ell, lease, assign, mortgage or otherwise dispose of or encumber the whole or part of its property that is necessary or useful in the performance of its duties to the public." Nevertheless, pursuant to 35-A M.R.S. § 1101(4), "[t]ransactions involving utility property that do not materially affect the ability of a utility to perform its duties to the public do not require commission authorization" even when that property is otherwise "necessary or useful" pursuant to section 1101(1)(A). Again, the statute provides no guidance on how to determine whether property is "necessary or useful" or will not "materially affect" the utility's ability to perform its duties, and is therefore ambiguous in that regard. 35-A M.R.S. § 1101(1)(A), (4).

[¶14] Although the Commission concluded that the property FWC proposed to lease to NWNA—Well #1, approximately two acres of land, and certain equipment—was "necessary or useful" to FWC pursuant to section 1101(1)(A), it

also apparently concluded that the lease of the property would not "materially affect" FWC's ability to serve the public pursuant to section 1101(4), and that the agreement therefore did not violate the statute. In particular, the Commission found that although FWC's other customers were served by water drawn from the same aquifer as the well leased to NWNA, "the efforts of the parties . . . to insure that the Company and the Commission can monitor water levels at [that] aquifer and interrupt NWNA's use of the water there under the circumstances cited in the Proposed Agreement and the 2013 Stipulation" provided adequate protection that the property leased to NWNA did not materially affect FWC's ability to supply water to its customers.

[¶15] In making this determination, the Commission applied the "no net harm" standard, by which it analyzed "whether the contract will neither be adverse to the public interest nor inconsistent with the interests of the Company's ratepayers and investors." Contrary to Taylor's contention, there is no authority pursuant to which the Commission was required to analyze this matter based on a prudence or reasonableness test, and no authority that prohibits application of the no net harm standard. Rather, Taylor seems to be arguing that the Commission should have applied to this lease the standard by which *ratemaking* is determined and costs are assessed. *E.g.*, 35-A M.R.S. § 301(2) (2015) ("The rate, toll or charge, or any joint rate made, exacted, demanded or collected by any public utility

12

for production, transmission, delivery or furnishing of electricity, gas, heat or water . . . shall be just and reasonable."); 35-A M.R.S. § 303 (2015) ("In fixing a reasonable value, the commission shall give due consideration to evidence of the cost of the property when first devoted to public use and the prudent acquisition cost to the utility . . . ."); 35-A M.R.S. § 6109(3) (2015) ("The sale of consumer-owned water utility land pursuant to this subsection may not be considered unreasonable or imprudent solely by reason of its sale at a price below market value."); *see also* 35-A M.R.S. § 707(3) (2015) (requiring the Commission to evaluate an agreement between a public utility and an affiliated interest by determining whether the contract or arrangement is "adverse to the public interest"). As these provisions illustrate, the Legislature is capable of establishing a particular standard for considering a given inquiry when it wishes to do so. In contrast, section 1101 imposes no requirements on the Commission in its choice of a method for determining whether the property at issue in the lease is "necessary or useful" in otherwise providing utility service. 35-A M.R.S. § 1101(1). The Commission's decision as to section 1101 was reasonable.[8]

---

[8] We are also not persuaded by Taylor's contention that the Commission erred by approving the proposed agreement because it improperly restrains the Commission's own ability to set rates in the future. The proposed agreement plainly states that FWC is charging NWNA the tariff rate for water, and that if the tariff rate is changed with Commission approval in the future, FWC will then charge NWNA the new applicable tariff rate. The agreement does not purport to afford FWC any authority that properly lies with the Commission—nor could it—and instead merely allows FWC to alter the rate charged to NWNA based on changes wrought by the Commission. *See* 35-A M.R.S. § 103 (2015) (setting out the basic powers and duties of the Commission).

[¶16]  In sum, we discern no abuse of discretion or violation of a statutory or constitutional provision in the Commission's decision approving FWC's proposed agreement with NWNA, and we therefore affirm that decision.  *See Office of the Pub. Advocate*, 2015 ME 113, ¶ 15, 122 A.3d 959.

The entry is:

Decision affirmed.

---

**On the briefs:**

Bruce A. McGlauflin, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellants Bruce D. Taylor and Food and Water Watch

Andrew S. Hagler, Esq., Mitchell M. Tannenbaum, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

William C. Black, Esq., Maine Public Advocate Office, Augusta, for appellee Maine Public Advocate Office

James L. Costello, Esq., and Benjamin M. Leoni, Esq., Curtis Thaxter LLC, Portland, for appellee Fryeburg Water Company

**At oral argument:**

Bruce A. McGlauflin, Esq., for appellants Bruce D. Taylor and Food and Water Watch

Jordan D. McColman, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

James L. Costello, Esq., for appellee Fryeburg Water Company

Public Utilities Commission docket number 2012-00487
FOR CLERK REFERENCE ONLY